IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
MAY 2000 Session

## MICHAEL JOSEPH SPADAFINA v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Benton County**
**No. CR-451     Julian P. Guinn, Judge**

---

**No. W1999-00268-CCA-R3-PC - Filed October 23, 2000**

---

The Benton County Circuit Court dismissed Michael Joseph Spadafina's petition for post-conviction relief in which Spadafina raised a number of issues of trial error and ineffective assistance of trial counsel in his conviction of first degree murder. On appeal, the petitioner limited his issues to the ineffective assistance of counsel in not seeking an individual, sequestered *voir dire* of the jury and in not challenging the use of damaging character evidence. Because we conclude that the petitioner failed to carry his post-conviction burden to prove his claims by clear and convincing evidence, we affirm the dismissal of the post-conviction petition.

**Tenn. R. App. P. 3; Judgment of the Trial Court is AFFIRMED.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Victoria L. Dibonaventura, Paris, Tennessee, for the Appellant, Michael Joseph Spadafina.

Michael E. Moore, Solicitor General, Kim R. Helper, Assistant Attorney General, G. Robert Radford, District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The petitioner, Michael Joseph Spadafina, appeals the Benton County Circuit Court's dismissal of his petition for post-conviction relief. In 1995, a Benton County jury convicted the petitioner of the first degree murder of Paul Burns, and the trial court sentenced the petitioner to life imprisonment. This court affirmed the petitioner's conviction. See State v. Spadafina, 952 S.W.2d 444 (Tenn. Crim. App. 1996), perm. app. denied (Tenn. 1997). In this appeal, the petitioner presents the following issues for our review:

1. Whether trial counsel was ineffective in failing to move the trial court to order individual *voir dire* in the jury selection process.

2. Whether trial counsel was ineffective in failing to challenge, or in one case, sponsoring evidence which reflected negatively on the petitioner's character.

Because we conclude that the petitioner failed to carry his post-conviction burden of showing that trial counsel was ineffective, we affirm the trial court's dismissal of the post-conviction petition.

## I. FACTS.

## A. The Petitioner's Trial.

In a sharply contested trial, the state theorized that Brenda Burns, the victim's ex-wife, hired the petitioner and his houseguest, Vito Licari, to kill the victim and that the two men, acting in concert, murdered the victim on December 13, 1994. The state relied heavily upon Licari's testimony that the petitioner cut the victim's throat while Licari tried ineffectually to strangle the victim. The petitioner admitted that he was present during the homicide but denied the murder-for-hire arrangement and denied participating in the killing.

In Licari's direct testimony as a state witness, he admitted he was a "thief" who had spent a total of eighteen years in prison for various offenses including burglaries and larcenies. He also acknowledged that he was HIV positive because of his use of needles to inject cocaine. He admitted that he planned to plead guilty to the first degree murder of Paul Burns and would receive a life sentence pursuant to a plea agreement.

Licari testified that Brenda Burns agreed to pay installments totalling $10,000 to hire the murder of Paul Burns. He detailed the use of fire insurance proceeds to finance the $1500 down payment on the murder contract. According to Licari, an insurance company paid a house fire loss claim to Paul Burns, and Brenda Burns converted some of the proceeds to use as the down payment. Licari testified that the petitioner claimed to have burned the victim's house in exchange for the victim's promise to pay him $5,000.[1] Licari claimed that the petitioner wanted to delay the murder

---

[1] On direct examination, Licari, as a state witness, testified as follows:

Q. Okay; now, did you and Mr. Spadafina come up – or was there some discussion concerning killing Paul Burns?

A. At one point there was. Ever since I was down here, which was about a month and a half, Michael was telling me how much he hated this old man, and somebody wanted him dead. But he was owed money by Mr. Burns. I believe there was a property fire. And Michael was supposed to get five thousand dollars from Mr. Burns. And he was owed twenty-three hundred dollars. So he told me Mr. Burns

(continued...)

until after the insurance proceeds were paid so that Paul Burns could pay the petitioner the $2300 Burns still owed on the arson fee.

Licari testified that "Michael Spadafina despised [the victim]. He may tell you he loved him, but he despised him."

Licari further testified that the petitioner signed an appearance bond on charges against the victim stemming from a check-kiting scheme in which all three men were involved. He described in some detail his role in assisting the petitioner and the victim to defraud banks by "kiting" checks.[2]

---

[1](...continued)

cannot be killed or die until he has paid the rest of the money.

Q. Do you know why he owed him that money?

A. Well, from Michael Spadafina, the story I got was that there was an arson at the property that Mr. Burns owned and Michael Spadafina had done it and he owed him five thousand dollars for doing it.

Q. All right; did the house - - you don't know when that happened?

A. That was prior to me coming to Tennessee.

[2] On direct examination, Licari testified as follows:

Q. [by General Radford:] Just go ahead and explain what they were doing - - -

A. Well, prior to my coming to Tennessee Michael had told me when he was down there the last time, in late October, about these bank scams he was pulling with Mr. Burns, and if I would come down to Tennessee he would guarantee me a thousand dollars. So that's how I ended up knowing about it. I have driven the car numerous times with Michael Spadafina and Paul Burns when they did these bank scams.

Q. What would they do?

A. What they would do is open false bank accounts, depositing a hundred dollars in a bank to open the account, go to another bank, deposit a hundred dollars, then open another account. Once they received checkbooks, they give you temporary checkbooks or whatever you want to call them, they would go from one bank, write out a check from the other account and cash the check, or would deposit it rather, and withdraw a certain amount on the check. And they were doing this back and forth in different counties. And that's how we were living.

Q. They were kiting checks?

A. Yes, sir.

(continued...)

-3-

After Brenda Burns converted some of the insurance proceeds and paid the initial installment for the murder, Licari and the petitioner decided to kill Paul Burns that night during a drive in the petitioner's car. According to Licari, the petitioner drove the car, Paul Burns occupied the front passenger seat, and Licari sat in the back seat. When the petitioner gave a signal, Licari unsuccessfully attempted to strangle Burns with a cord. The petitioner stopped the car, came around to the passenger side, and cut the victim's throat with a knife from his kitchen. Licari testified that the two then carried the body to the top of an embankment.

In his case-in-chief, the petitioner presented evidence which suggested that it was the victim and Licari who were kiting checks and that the petitioner had himself been victimized by one of the victim's bad checks. He showed that the victim was an elderly, diabetic man, that the petitioner and the victim "were real close, good friends," and that after the victim's house burned, the petitioner provided shelter for the victim and assisted him with meals, laundry, medication and transportation. The victim was once married to the petitioner's aunt. The petitioner was attentive to the victim's ten-year-old son. The petitioner showed that he attended a local Presbyterian church, had been gainfully employed at various jobs since arriving in Tennessee, was paying for a house and eight acres where he and his fiancée milked a cow and raised chickens, and provided the charity of food and shelter for both the victim and Licari. Through investigating officers and a paramedic, the petitioner attempted to show that the victim's body had been dragged, not carried as Licari claimed, up the embankment to where it was found. Finally, the petitioner presented three witnesses, including one who was incarcerated in the Benton County jail with Licari after his arrest for the murder, who testified that Licari admitted that he, acting alone, killed Paul Burns and that he described the murder in detail. Audrey Coppola, the petitioner's fiancée, testified that Licari "disliked [the victim] intensely," and her ten-year-old son testified that Licari said that he would kill the victim "one of these days."

The petitioner testified that he and the victim became acquainted when both lived in New York. The victim came to Tennessee under the federal witness relocation program and asked the petitioner to join him in this state. The petitioner moved to Tennessee in the summer of 1994.

---

2(...continued)

Q. Now, that's how you got you income?

A. Well, Michael was giving me money and I was getting part of the money from the checks, yes.

Q. Okay; so you were in on it?

A. Yes, sir, I was.
. . .
Q. All right; and did the law begin to catch up with you or with - -
. . .
A. With Mr. Burns, the warrants were falling in different counties. And he had to appear in different counties for different cases on the check kiting.

Later that year, the petitioner invited Licari, with whom he had been incarcerated in New York, to come to Tennessee as well. Audrey Coppola had urged the petitioner to invite Licari to stay with them in Tennessee because she was concerned about Licari's cocaine addiction and his HIV infection.

The petitioner denied any involvement in the Burns house fire and stated that he and the victim were at the bank when the house caught fire. He also denied any involvement in the victim's check-kiting activities.

The petitioner testified that he and Mrs. Burns gave the victim all of the insurance checks and that, from the proceeds, the victim gave the petitioner $2,200, part of which the victim paid toward the petitioner's home mortgage note. The petitioner denied any agreement with Mrs. Burns to kill the victim.

In the petitioner's version of the fatal car ride, Licari unexpectedly attacked the victim. The petitioner ran the car off the road trying to reach for the rope Licari held around the victim's neck. Licari then threatened the petitioner with a knife and ordered him to stop the car. After the petitioner stopped and began to walk away, Licari ordered the petitioner to return. The petitioner testified that when he returned to the car, the victim was dead and Licari threatened to kill him if he did not cooperate in disposing of the body and concealing the crime. However, during the ensuing two days, the petitioner declined to report the murder. He testified that he feared that Licari would kill him or implicate him in the murder and would kill his fiancée and her two children. He also declined to report the murder when he attended court the day after the murder as the surety on the victim's bond, when the petitioner was in the presence of numerous law enforcement officers. He also met with the sheriff of Humphreys County and asked about being relieved from the victim's appearance bond. During the visit, the petitioner never mentioned the homicide or the need to be protected from Licari.

> At trial, the state argued to the jury in closing,
> There's been no proof, really, of any legitimate income at all that [the petitioner] made last year. But I submit to you that the proof in this case has shown that he had some other irons in the fire, that he and Paul Burns were riding around West Tennessee kiting checks. . . . And the proof has also shown that on September the 20th the defendant, Michael Spadafina, called [the insurance agency] and said that Mr. Burns wants . . . to increase the insurance coverage on that house . . . [to] a total of thirty thousand. Well, fifteen days later . . . that house mysteriously burns down. And in the ensuing weeks and months it's Michael Spadafina who is calling the insurance adjusters, saying when are the checks going to be ready, what can I do to help you get the money to Mr. Burns.
> 
> . . .

But there's another opportunity for the defendant to make some money. He enters into negotiations with Vito Anthony Licari, the hardened criminal that he brought to Tennessee, and Brenda Burns, the ex-wife of Paul Burns. . . . A great opportunity to make some money.

A deal was struck, a bargain.

After hearing the evidence, the jury convicted the petitioner of the first degree murder of Paul Burns, but was unable to agree on a sentence. Therefore, the trial court sentenced him to imprisonment for life.

## B. The Post-Conviction Hearing.

In the petitioner's post-conviction hearing, he introduced a transcript of the trial proceedings and called his trial counsel, Terry J. Leonard, to testify. Mr. Leonard acknowledged that, before the trial began, he was concerned about pretrial newspaper publicity. The trial judge preliminarily questioned the prospective venire, followed by counsel's *voir dire*. Prospective jurors were either excused or retained based upon their general answers to questions about their prior knowledge of the case, without the prospective jurors being pressed to state "what it was that they heard." Mr. Leonard testified that he did not explore the details because he feared that the answers to probing questions would taint the remaining jury pool. After discussion with the petitioner, he decided not to request a venue change, nor did he ask the trial court to order individual *voir dire* of prospective jurors. Mr. Leonard felt that, based upon his twelve years experience practicing law in Benton County, he knew most of the people and was comfortable with their "philosophy" in disposing of criminal cases. He believed the local "point of view" would benefit the petitioner.

Mr. Leonard discussed each juror challenge with his client, and the two of them collaborated on decisions to excuse and retain jurors, including one juror who was the brother-in-law of a deputy sheriff in Benton County.

Prior to trial, Mr. Leonard was aware that the fire insurance proceeds played a part in the state's theory of murder for hire, and he knew that the petitioner was a surety on the victim's bond in the check-kiting or bank fraud charges. Mr. Leonard had reviewed five prior statements made by Licari; however, he was unaware that Licari would testify at trial that the petitioner was involved in the arson and check-kiting. Consequently, he filed no pretrial motion to exclude this evidence. He thought evidence about the source of the money that the victim paid to the petitioner or on his account "would come in, and, in fact, that would be admissible." Nevertheless, when testimony was introduced at trial that the petitioner was the arsonist, Mr. Leonard did not object and did not ask for a jury-out hearing. Neither did he effectively object nor did he seek a hearing when trial testimony implicated the petitioner in the check-kiting scheme.

Mr. Leonard testified that the defense theorized that the petitioner "did not kill or act in concert" with Licari to kill Paul Burns. He opted for a strategy to sully both Licari and the victim, and to this end, he intended to show the jury that the victim was a Mafia-type criminal from New York who came to Benton County, Tennessee under the federal witness relocation program. The petitioner agreed to the strategy of putting the victim "on trial." In light of this strategy, counsel believed that the information which was imparted to the jury about the defendant's role in arson and check-kiting was not prejudicial to the defense because this information confirmed the victim's and Licari's involvement in criminal activity. However, Mr. Leonard acknowledged that this strategy ultimately allowed the state to argue that, because the petitioner was an arsonist and a check-kiter, he would commit murder for hire. Mr. Leonard testified on cross-examination that, had the state not introduced evidence of the victim's and Licari's criminal lifestyles, he would have done so. To this end, he willingly allowed the jury to know that the petitioner had been incarcerated in New York to inform the jury of Licari's criminal past. He tried to develop proof to show that although the victim and Licari had persisted in their errant ways, "out doing whatever criminal activity they wanted to do," the petitioner was leading a responsible lifestyle in Tennessee and that he "was out trying to work" in order to support his family.

Finally, Mr. Leonard testified that he and his office staff invested many, many hours in preparation for the defense. Ultimately, when the case went to the jury, Mr. Leonard believed they had succeeded in presenting an optimum defense that would win an acquittal.[3]

## II. GOVERNING PRINCIPLES OF LAW.

### A. Post-Conviction.

The post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). On appeal, the appellate court accords to the trial court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997); Bates v. State, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997).

### B. Ineffective Assistance of Counsel.

---

[3] The petitioner did not testify at the post-conviction hearing; however, he addressed the court and voiced his disagreement with the manner in which post-conviction counsel handled the proceeding. Primarily, he was aggrieved that she limited her focus to proving grounds of ineffective assistance of counsel that were raised in this appeal. He expressed dissatisfaction with post-conviction counsel's decision to abandon other issues, such as prosecutorial misconduct and concealment of exculpatory evidence, which he had included in the post-conviction petition. He also complained of counsel's unwillingness to call the District Attorney General as a witness at the post-conviction hearing. The decision of which claims should be pursued are ultimately one of strategy, which is a matter entrusted to counsel. King v. State, 904 S.W.2d 319, 334 (Tenn. 1999).

The Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution both require that a defendant in a criminal case receive effective assistance of counsel. Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975). When a defendant claims ineffective assistance of counsel, the standard applied by the courts of Tennessee is "whether the advice given or the service rendered by the attorney is within the range of competence demanded by attorneys in criminal cases." Summerlin v. State, 607 S.W.2d 495, 496 (Tenn. Crim. App. 1980).

In Strickland v. Washington, the United States Supreme Court outlined the requirements necessary to demonstrate a violation of the Sixth Amendment right to effective assistance of counsel. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984). First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and must demonstrate that counsel made errors so serious that he was not functioning as "counsel" guaranteed by the Constitution. Id. at 687, 104 S. Ct. at 2064. Second, the petitioner must show that counsel's performance prejudiced him and that errors were so serious as to deprive the petitioner of a fair trial, calling into question the reliability of the outcome. Id.; Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997).

"When addressing an attorney's performance it is not our function to 'second guess' tactical and strategic choices pertaining to defense matters or to measure a defense attorney's representation by '20-20 hindsight.'" Henley, 960 S.W.2d at 579 (quoting Hellard v. State, 629 S.W.2d, 4, 9 (Tenn. 1982). Rather, a court reviewing counsel's performance should "eliminate the distorting effects of hindsight . . . [and] evaluate the conduct from the perspective at the time." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996). On the other hand, "deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." Id.

To establish prejudice, a party claiming ineffective assistance of counsel must prove a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.

### III. THE PETITIONER'S ISSUES.

### A. Ineffective Assistance of Counsel - - *Voir Dire* of Jury.

The petitioner claims that his trial counsel performed deficiently when he failed to press the trial court to conduct individual *voir dire* of the prospective jurors. Implicitly, the petitioner also claims that trial counsel failed to ask prospective jurors specific questions about their exposure to pretrial publicity and thereby failed to ferret out possible juror biases.

A trial court's method of conducting jury *voir dire* in a criminal case must comport with constitutional due process notions of fundamental fairness. See Mu'Min v. Virginia, 500 U.S. 415, 426, 111 S. Ct. 1899, 1905 (1991). However,

> [u]nder the constitutional standard . . . , "[t]he relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant."

Id. at 430, 111 S. Ct. at 1908 (quoting Patton v. Yount, 467 U.S. 1025, 1035, 104 S. Ct. 2885, 2891 (1984)). The law does not require that the jurors be "ignorant of the facts and issues involved." Id. "[J]urors may sit on a case, even if they have formed an opinion on the merits of the case, if they are able to set that opinion aside and render a verdict based upon the evidence presented in court." State v. Mann, 959 S.W.2d 503, 531 (Tenn. 1997).

With respect to the method of conducting *voir dire*, Tennessee courts have recognized that "where the crime is highly publicized, the better procedure is to grant the defendant individual, sequestered voir dire, but it is only where there is a 'significant possibility' that a juror has been exposed to potentially prejudicial material that individual voir dire is mandated." State v. Cazes, 875 S.W.2d 253, 262 (Tenn. 1994); see also State v. Smith, 993 S.W.2d 6, 29 (Tenn. 1999); State v. Cauthern, 967 S.W.2d 726, 749 (Tenn. 1998); State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994).

Concerning the content of *voir dire* questioning, "both the degree of exposure [to potentially prejudicial information] and the prospective juror's testimony as to his or her state of mind shall be considered in determining [a juror's] acceptability." Tenn. R. Crim. P. 24(b)(2). However, the presence of pretrial publicity does not mean that *voir dire* "questions regarding the content of any publicity to which [prospective] jurors have been exposed" are constitutionally required. Cazes, 875 S.W.2d at 262; see also Mu'Min, 500 U.S. at 431-32, 111 S. Ct. at 1908; Stephenson, 878 S.W.2d at 540. Even under Rule 24,

> [i]f the prospective juror has seen or heard and remembers information that will be developed in the course of trial, or that may be inadmissible but is not so prejudicial as to create a substantial risk that his or her judgment will be affected, the prospective juror's acceptability shall depend on whether the testimony as to impartiality is believed.

Tenn. R. Crim. P. 24(b)(2). Indeed, in light of the trial judge's opportunity to hear and observe the prospective jurors, courts have deferred to the trial judge to determine the ability of a prospective juror to impartially hear the case. Mu'Min, 500 U.S. at 427, 111 S. Ct. at 1906.

Accordingly, the acceptance of jurors in the face of "pretrial publicity and in other areas of inquiry that might tend to show juror bias" is entrusted to the discretion of the trial court.

Id.; Cazes, 875 S.W.2d at 262. Given this deference, a "trial court's findings of juror impartiality may be overturned only for 'manifest error.'" Cazes, 875 S.W.2d at 262; see also Cauthern, 967 S.W.2d at 749.

In summary, individual, sequestered *voir dire* is not required unless the case is highly publicized and there exists a significant possibility that prospective jurors have been exposed to prejudicial information. Smith, 993 S.W.2d at 29; Cauthern, 967 S.W.2d at 749. Otherwise, "prospective jurors who have been exposed to information which will be developed at trial are acceptable, if the court believes their claims of impartiality." Mann, 959 S.W.2d at 532.

We have reviewed the transcript of the jury selection phase of the trial. Although several prospective jurors indicated an awareness of the case as a result of local newspaper articles,[4] the record reflects a benign interest in the case. Of those who had read or heard about the case, only one indicated that he may have formed some opinion about the case, and this juror was excused via peremptory challenge. One juror was excused after he expressed an opinion about the petitioner's guilt because a warrant had been issued, and as many as five potential jurors were excused by the court when they indicated personal connections to witnesses or parties in the case. However, there were no indications that strong feelings or opinions about the case had developed among the prospective jurors or that the newspaper reports were sensational or provocative. Moreover, the record does not reflect the amount, nature, extent, depth, specificity, or the prejudicial potential of the pretrial media coverage of the case.

In short, the record is devoid of any proof which supports a claim that counsel was ineffective in failing to pose more probing questions to the jurors or in failing to ask the court for individual, sequestered *voir dire*. Counsel cannot be said to have deficiently performed in not seeking individual *voir dire* when neither the record at trial nor the post-conviction record illustrates that the case was "highly publicized" or that any significant possibility of exposure to *prejudicial* information existed.

Furthermore, the record indicates no basis for the trial court to grant individual *voir dire* and no basis on appeal for finding an abuse of discretion. Hence, the petitioner has demonstrated no prejudice in the failure to move for individual *voir dire*. Also, the record reflects no basis for concluding that the petitioner was prejudiced when counsel failed to ask more probing questions about the prospective jurors' pretrial information.

Finally, we note that counsel's concern that the responses to more probing questions might have tainted the other prospective jurors is not itself a basis for the trial court ordering individual *voir dire*. Without a showing of the predicate "significant possibility" of prejudicial impact, the trial court was under no mandate to grant such a request.

---

[4] By our count, 24 prospective jurors had heard or read newspaper articles about the case, and seven had heard or read nothing.

The petitioner has failed to establish ineffective assistance of counsel in these issues.

## B.  Ineffective Assistance of Counsel - - Character Evidence.

The petitioner argues that trial counsel was ineffective because he failed to challenge evidence which impugned the petitioner's character by establishing the petitioner's previous incarceration in New York with Vito Licari,[5] and the petitioner's participation in arson and check kiting.  Additionally, the petitioner is aggrieved that trial counsel sponsored evidence of the New York incarceration.  He claims that the use of all of the above evidence was barred by Tennessee Rules of Evidence 402, 403, and 404(b).  He acknowledges that he may have been vulnerable to witness impeachment via the use of the prior felony conviction of possession of stolen property which resulted in the New York imprisonment, but he argues that the state-sponsored character evidence was introduced before he decided to testify.  Furthermore, the petitioner complains that the state exploited the prejudicial nature of this evidence during its closing argument.

Evidence that is not relevant is inadmissible.  Tenn. R. Evid. 402.  Otherwise admissible relevant evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.  Moreover, character evidence to prove "action in conformity with the character or trait on a particular occasion" is generally inadmissible.  Tenn. R. Evid. 404(a).  More specifically,

> [e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>         (1) The court upon request must hold a hearing outside the jury's presence;
>         (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>         (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

---

[5]        The petitioner argued that the victim's former status as a crime-family figure reflected negatively upon him, although it is not clear whether this reflection stems from the fact that he and the victim both had southern European surnames, or whether it was because the victim had been married to the petitioner's aunt.

There is no question of fact about the content of the testimony of Licari and other witnesses. The transcript of the trial testimony was exhibited to the post-conviction record. Therefore, the trial court was not required to find facts regarding the content of trial testimony concerning the petitioner's incarceration and his alleged arson and check-kiting activities. Also, it is not open to question that trial counsel did not make Rule 404(b) objections to the state's presentation of this evidence. Accordingly, our review of whether counsel was ineffective is *de novo*. See State v. Burns, 6 S.W. 3d 453, 461, (Tenn. 1999).

An analysis of the effectiveness of trial counsel in handling the character evidence issues requires some understanding of the sequence and timing of the presentation of the character evidence components. TBI Agents Thomas Lewis and Christopher Thomas Carpenter investigated the homicide and testified early in the state's case-in-chief. On direct examination, Agent Lewis read to the jury the defendant's unredacted pretrial statements which included information that the victim's real name was Piero Arthur Frapollo and the victim was a twenty-year member of the Colombo crime family who left New York and came to Tennessee under the auspices of the federal witness relocation program. On cross-examination of Agent Carpenter, defense counsel prompted the witness to read an "agent's note," which is a memorandum an agent puts in his investigation file. Along with information favorable to the petitioner, the agent's note imparted to the jury information that the petitioner had been previously incarcerated with Licari.

Vito Licari testified immediately after Agent Carpenter. On the state's direct examination, Licari acknowledged his own criminal history but mentioned that he had been incarcerated in New York with the petitioner and testified in some detail about the petitioner's involvement in arson and check kiting.

In the petitioner's case-in-chief, he presented evidence that Licari and the victim were involved in the check-kiting scheme. The petitioner's fiancée testified that the petitioner had been incarcerated with Licari in New York. The petitioner testified that he had been incarcerated in New York for ten months, that Licari was a cocaine user who carried the HIV virus, and that the victim, *alias* Piero Arthur Frapollo, was relocated in Tennessee by the federal justice department. He denied involvement in the arson and check-kiting activity.

Additionally, the petitioner introduced evidence of examples of his good character traits and showed that he worked and sought gainful employment, attended church, supported his fiancée and her children, and served as Good Samaritan to Licari and the victim.

**(1)**

Trial counsel's strategy called for depicting the victim and Licari as unreformed criminals, while depicting the petitioner as a responsible citizen and family man. Implementing the strategy required showing the victim's real name and that the victim was a criminal type who lived in Tennessee under the federal witness protection program. Evidence of this nature was reasonably promoted by the petitioner because the issue of the petitioner's guilt rose or fell on the credibility

-12-

of witnesses. Counsel's strategy fostered confidence in the petitioner's credibility and disparaged that of the victim and Licari. We discern no deficient performance in the tactical choice to use this evidence.

**(2)**

Also, we find no prejudice in the jury's hearing evidence of the petitioner's previous incarceration in New York. The petitioner testified at his trial, and facing impeachment via the New York conviction of possession of stolen property, he admitted the conviction on direct examination. Although the conviction could only be used against the petitioner for impeachment purposes, see Tenn. R. Evid. 609(a), the prejudicial impact of the evidence of the New York incarceration was effectively diminished by the jury being informed of the conviction underlying the incarceration. To be sure, the petitioner argues that he did not elect to testify until after the state presented the bad character evidence, but we find nothing in the record which suggests that his decision to testify emanated from anything other than his desire to controvert Licari's accusations about the murder. Thus, we see no prejudice to the petitioner as a result of the jury hearing about the New York incarceration.

**(3)**

The substantive use of the evidence of the petitioner's alleged arson and check-kiting activities, however, requires a more complex analysis. In the absence of a defense challenge on the basis of Rules 402, 403, or 404, Licari, as a state witness, injected these two evidentiary components into the case. First, we must determine whether the evidence was admissible via Licari.

The state argues that the arson and check-kiting evidence is justified by Tennessee Rule of Evidence 404(b), because, rather than showing "action in conformity with [a] character trait," the evidence was admissible for "other purposes." See Tenn. R. Evid. 404(b). In this case, the state says the evidence of arson was admissible "to prove the source of the funds used to pay the defendant and Vito Licari for killing the victim," and the evidence of check-kiting "was admissible to show the relationship between the parties." We are unpersuaded that Rule 404(b)'s "other purposes" exception would have provided a threshold for the admission of these two components of proof, had counsel made proper objections. The only evidentiary importance of the fire insurance money seems to be that the insurance company in fact paid proceeds which provided cash and enabled a murder-for-hire scheme. That the murder had to be delayed so that the petitioner could collect a debt owed him by the victim also may have been relevant. However, neither of these two bases for proving the flow of insurance proceeds required disclosure of the petitioner's alleged participation in arson. Furthermore, we fail to see any relevance of the alleged check-kiting aspect of the petitioner's and the victim's relationship to the state's theory of the homicide. Thus, we hold

that the evidence of the petitioner's alleged arson and check-kiting was inadmissible pursuant to Rule 404(b), as of the time Licari testified.[6]

The conclusion that trial counsel could have taken steps to effectively exclude or limit the impact of inadmissible evidence does not end the inquiry into counsel's performance. We must consider whether counsel may be accredited for determining that the evidence, though inadmissible at the time it was presented, could have facilitated the trial strategy, or if not, that disclosure of the evidence was a necessary and justifiable risk of a worthy strategy. We reject out of hand any notion that evidence of the petitioner's alleged arson and check kiting *per se* advanced counsel's strategy. However, we must ascertain whether counsel deficiently performed by acquiescing unreasonably or unnecessarily in the use of prejudicial evidence or whether the choice of strategy made inevitable the disclosure of the accusations that the petitioner burned a house for money and kited checks.

The inquiry into the inevitability of this evidence is initially informed by the law of rebuttal and Tennessee Rules of Evidence 404 and 405. Competent evidence is generally admissible to explain, directly reply to, or contradict material evidence introduced by the opposing party. Nease v. State, 592 S.W.2d 327, 331 (Tenn. Crim. App. 1979). If counsel reasonably foresaw that the implementation of his strategy would lead to the use of the arson and check-kiting accusations in rebuttal, then a conscious decision not to challenge the evidence in the state's case-in-chief may well be a supportable tactic. Moreover, in such a scenario, a negligent failure to challenge the evidence would have entailed no prejudice.

The petitioner opened the door to his own character traits for industry, devotion to his family, and general bonhomie. As explained above, he introduced evidence of specific instances of his admirable traits. The claim that the petitioner was the victim's benefactor was perhaps belied by Licari's testimony of the arson arrangement, and the petitioner's claims that he was a wage-earning family man would have been logically countered by the claim he was actively involved in the arson and bank fraud. However, a logical connection to rebuttal evidence does not end the inquiry when the rebuttal evidence would show specific instances of the bad character of the defendant.

To be sure, evidence of a "pertinent character trait" may be offered by a criminal defendant or "*by the prosecution to rebut the same.*" Tenn. R. Evid. 404(a)(1) (emphasis added). However, the Rules limit the use of positive character evidence by the criminal defendant, or the state's use of negative evidence to rebut the same to reputation or opinion testimony via a "character" witness. See Tenn. R. Evid. 404(a)(1), 405(b). Inquiry into "specific instances of conduct" may be made only when cross-examing the character witness, and extrinsic evidence of

---

[6] A proper, timely objection should have resulted in the evidence being excluded. We realize, however, that the testimony implicating the petitioner in arson and check kiting was a surprise to trial counsel, and some of the accusations were injected before counsel had an opportunity to object and seek exclusion. Nevertheless, a motion to strike and to ask the court to give cautionary, limiting instructions to the jury should have been well received. Also, a motion for the ordering of a mistrial would have been on point.

specific instances of the defendant's misconduct is not permitted. N. Cohen, Tennessee Law of Evidence § 405.3, at 196 (3d ed. 1995). In a broad sense, some of the defense witnesses at trial may be viewed as character witnesses to the extent that they affirmed the petitioner's traits of industry and benevolence, and they were subject to cross-examination about their knowledge of the arson-for-hire and the check-kiting claims.[7] However, extrinsic evidence of these claims would not have been admissible in rebuttal. If counsel assumed otherwise, he was in error.

That said, our inquiry into the adequacy of counsel's performance does not end here. In applying the mandated objection standard to evaluate counsel's performance, we must consider the benefits to the defense of a tactic of acquiescing in the use of incompetent state proof as a means of enabling *the defense to rebut* with favorable, but equally incompetent proof.

Tennessee has long recognized a "good-for-the-goose, good-for-the-gander" rule that "if a party opens the door for the admission of incompetent evidence, he is in no plight to complain that his adversary followed through the door thus opened; and this, although no objection was made in the first instance to the admission of such evidence." Thomas v. State, 121 Tenn. 83, 87, 113 S.W. 1041, 1042, (1908); see also Garrison v. State, 163 Tenn. 108, 121, 40 S.W.2d 1009, 1013 (1931). As we have shown above, the state presented inadmissible evidence through Licari, without objection, that the petitioner burned a house and defrauded banks. Then, the petitioner in his case-in-chief offered witnesses to testify to *specific instances* of the petitioner's good conduct, evidence which was itself inadmissible. See Tenn. R. Evid. 405(a). Even though the state generally made no objection to the petitioner's improper method of placing his character in issue, the petitioner was in a position because of the Thomas rule to use his favorable specific-instance evidence, when otherwise his attempts to show his good character would have been limited to opinion or reputation evidence. Id. Through this device, the petitioner presented evidence of his reform from crime by showing specific examples of his work ethic, family values, and beneficent nature. Undoubtedly, the good conduct evidence promoted the petitioner's strategy and, for all we know, may have given him his best chance for acquittal. To be sure, the strategy, as played out through the tactics of trial counsel, had the potential for gain as well as loss. See Profit v. Waldron, 831 F. 2d 1245, 1249 (5th Cir. 1987). For this reason, we defer to both counsel's choices of strategy and the tactics he employed to implement the strategy. As a result, we hold that counsel did not deficiently perform with respect to the arson and check kiting evidentiary issues.

---

[7] In fact, the state took the opportunity to cross-examine these defense witnesses on these issues. The witnesses denied knowledge of the petitioner's involvement in arson or check-kiting.

We discern that the petitioner could have been impeached as a witness through cross-examination about activities to defraud banks and an insurance company, pursuant to the impeachment through prior bad acts provisions of Tennessee Rule of Evidence 608(b). In fact, he was cross-examined about these issues. However, he denied involvement in the arson and check-kiting, and the state should have been relegated to "taking his answer." The state would not have been permitted to present extrinsic proof of the prior bad acts, as it would have been permitted to do in the case of impeachment through prior convictions. Compare Tenn. R. Evid. 608(b) with Tenn. R Evid. 609(a)(1).

Our inquiry, mercifully, is now at an end.  Having found no deficiency in counsel's performance, we need not address the prejudicial effect of the defense strategy or tactics.  <u>Henley</u>, 960 S.W.2d at 580.

## IV.  CONCLUSION.

Accordingly, we conclude that the petitioner failed to show by clear and convincing evidence that he received the ineffective assistance of trial counsel, and we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE