# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
August 3, 2010 Session

## STATE OF TENNESSEE v. LAKEITH HUMPHREY

**Direct Appeal from the Criminal Court for Shelby County**
**No. 07-03131     Lee V. Coffee, Judge**

---

**No. W2009-01367-CCA-R3-CD   -   Filed March 15, 2011**

---

The defendant, LaKeith Humphrey, was convicted of premeditated first degree murder. He was sentenced to life with the possibility of parole. On appeal, he argues that: the evidence was insufficient to support his conviction; the trial court erred in granting a special jury instruction; the trial court abused its discretion by allowing some testimony and limiting other testimony; the trial court erred in admitting the murder weapon into evidence; and the cumulative effect of these errors suffices to justify a new trial. After careful review, we affirm the judgment from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and J.C. MCLIN, JJ., joined.

William Massey, Memphis, Tennessee, for the appellant, LaKeith Humphrey.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; William L. Gibbons, District Attorney General; Paul Hagerman and Cavett Ostner, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

On the night of November 28, 2006, the victim in this case, Gina James, was tragically shot and killed through her bedroom window. The defendant, who had worked in law enforcement, occasionally dated the victim while she was in the process of getting a divorce. Their relationship was sometimes turbulent; they would periodically break up, and then later get back together. On at least two occasions, after the victim broke up with the defendant, incidents occurred that caused the victim to briefly reconcile with the defendant out of an apparent need for protection. For example, after one break-up, a brick was thrown through

the victim's window, and after another break-up, someone fired a gunshot at her car. With his background in law enforcement, the defendant appeared to offer the victim some degree of protection from an oft-violent world filled with unknown criminals and assailants. Her putative protector, however, was soon unmasked as something else entirely.

On the very night she was killed, witnesses testified that the victim broke up with the defendant by telephone. Several hours later, family members heard the sound of glass breaking in the victim's bedroom and discovered her, still conscious, lying on the floor in a pool of her own blood. They promptly called 911, requesting an ambulance and the police. Medical personnel arrived and attempted to help the victim, but she died a short time later.

Police arriving on the scene observed bullet holes in the victim's pillows, head board, and bedroom wall. There were corresponding bullet holes through the victim's bedroom window, which indicated that the bullets fired at the victim had been shot from outside that window, angled downward toward the bed. Outside the same window, police found five spent 9mm shell casings. Police also found smudges on the glass of the window about two feet above the bullet holes, consistent with a human face having been pressed against its surface. Police further determined that a person could see through the victim's bedroom blinds by pressing his or her face against the glass in this manner.

Investigating officers interviewed the surviving family members and, upon learning of the defendant's prior relationship with the victim, brought him in for questioning. The defendant claimed to have been at his job at an apartment complex working as a security guard at the time of the shooting and was released. However, the next morning, officers received a phone call from the defendant's mother, claiming that the defendant had told her that he was responsible for the victim's death. Officers arrested the defendant and brought him in for further questioning.

This time, the defendant asked to speak to one particular officer – a former childhood friend – alone. He told this officer that his brother had killed the victim. However, when the police brought the defendant's brother in for questioning, the brother denied any participation in the crime and gave police an alibi that was supported by two witnesses. When officers put the defendant and his brother together, the defendant again accused his brother of killing the victim. However, a short time afterward, the defendant admitted that he was in fact the one responsible for her death.

An officer executing a search warrant reviewed computerized video surveillance footage from the defendant's job on the night in question. The officer testified that this video footage showed that the defendant left his work place between 1:44 and 1:50 a.m. (before the shooting), and returned at 3:50 a.m (afterwards). When officers returned two or three days

later to take possession of the computerized video footage, they found that it had been destroyed. As best they could determine, an unknown individual had destroyed the computer hard drive containing the video by pouring an unidentified liquid onto it.

Several days later, Ronnie McLemore, a friend of the defendant, contacted the police and told them he had possession of a gun that had been given to him by the defendant shortly after the time of the shooting. According to Mr. McLemore, the defendant had told him that his son was coming into town and asked that he hold onto the gun until after his son's visit. Mr. McLemore agreed, took possession of the gun, and locked it in his safe. When he learned of the shooting, he decided to turn the gun over to the police. The TBI tested this gun and determined it to be the murder weapon by matching it both to a bullet removed from the victim's body and to the spent shell casings found outside the victim's window.

The defendant was indicted on May 1, 2007, for the first degree murder of Gina James. He was tried by jury and found guilty on February 6, 2009. The defendant was sentenced to life with the possibility of parole. The defendant filed a motion for new trial on March 6, 2009, which was denied. This appeal follows.

I.

First, the defendant argues that the evidence is insufficient to support his conviction for intentionally killing his former girlfriend. In Tennessee, great weight is given to the result reached by the jury in a criminal trial. A jury's verdict of guilty "accredits the testimony of the witnesses for the State, resolves all conflicts in favor of the theory of the State, and removes the presumption of innocence." *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). Such a verdict not only removes the presumption of innocence but affirmatively "raises a presumption of guilt" which a defendant must overcome by "showing that the evidence preponderates against the verdict in favor of his innocence." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Where sufficiency of the evidence is challenged, the relevant question for an appellate court "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e)*; State v. Abrams*, 935 S.W.2d 399, 401 (Tenn. 1996). The State is not only entitled to the strongest legitimate view of the evidence, but also to any and all reasonable inferences which may be drawn from that evidence. *See, e.g.*, *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003); *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000).

First degree murder is defined as the intentional and premeditated killing of another. T.C.A. § 39-13-202(a)(1) (2006). The defendant did not dispute that he was responsible for

the victim's death at trial and does not do so on appeal. Rather, he challenges only the issue of premeditation.

Premeditation is defined as "an act done after the exercise of reflection and judgment" and committed after the accused "was sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39-13-202(d) (2006). Intent is a question of fact for the jury to determine, and it may be proven by circumstantial evidence, including evidence of: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). In general, circumstantial evidence of premeditation should tend to show planning activity by the defendant, motive to cause the victim's death, and "facts about the *nature of the killing* from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to preconceived design." *State v. Gentry,* 881 S.W.2d 1, 4 (Tenn. Crim. App. 1993) (*quoting* 2 W.LaFave and A.Scott, *Substantive Criminal Law* § 7.7 (1986) (emphasis in original)) .

Our review of the record amply supports the premeditation found by the jury; indeed, there is evidence to suggest that almost all of the factors suggested in *Bland* and *Gentry* are present. Physical evidence and testimony showed that the victim was unarmed and was slain by a firearm wielded by the defendant. Evidence of cruelty also exists – the victim was in her bed at the time of the killing and was shot in the dark through her own bedroom window while her family members were present in the house. The victim's neighbor, Roderick Bowen, testified that the defendant had made prior threats against the victim, including "[b]itch, I'll kill you," and "I'll make a crime scene out of this." There was also evidence of planning before the crime and concealment efforts afterwards. The defendant's confession combined with security footage from his place of employment support a conclusion that the defendant attempted to set up an alibi prior to the killing by going to work, leaving his place of employment to kill the victim, and then returning to work as though nothing had happened. Additional evidence of the defendant's concealment activities includes the testimony of his friend Ronnie McLemore, who testified that the defendant attempted to hide the murder weapon by giving it to him following the murder under the pretext of needing to keep it away from his son. Although evidence of many of these factors, standing alone, might have sufficed, taken together, the evidence presented at trial was fully sufficient to support the jury's finding of premeditation.

II.

Second, the defendant claims that the trial court erred by granting the State's request

for a special jury instruction on the issue of premeditation. Special instructions are properly given when they "supply an omission or correct a mistake made in the general charge," "present a material question not treated in the general charge," or "limit, extend, eliminate, or more accurately define a proposition already submitted to the jury." *State v. Cozart*, 54 S.W.3d 242, 245 (Tenn. 2001). The decision to give or deny a special jury instruction is generally within the sound discretion of the trial court. We will reverse the trial court's decision to grant a special instruction on due process grounds "only if the jury was unfairly instructed on the legal issues or was misled regarding the applicable law." *Id.*

The special instruction challenged by the defendant at trial added the following language after the general premeditation instruction, Tennessee Pattern Jury Instruction 7.01(b):

> The court further charges you that the elements of premeditation may be inferred from the circumstances of the killing. The element of premeditation is a factual question to be determined by the jury from all the circumstances surrounding the killing. Several circumstances may be indicative of premeditation, including declarations of the intent to kill, procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the fact that the killing was particularly cruel, infliction of multiple wounds, the making of preparations before the killing for the purpose of concealing the crime, destruction or secretion of evidence and calmness immediately after the killing. A jury is not limited to any specific evidence in finding or inferring premeditation, but it may be established by any evidence from which a rational jury may infer that the killing occurred after the exercise of reflection and judgment. In addition to these factors, the establishment of the motive for the killing is yet another factor from which the jury may infer premeditation.

The intended function of this special instruction was to specify nine examples of types of circumstantial evidence that a jury might consider in reaching a proper conclusion on the premeditation issue (along with any other circumstantial evidence that might rationally support an inference that the defendant did or did not exercise reflection or judgment prior to committing the killing). This list of particular factors was drawn from Tennessee case law, which has specified these nine factors (among others) as relevant circumstances that will support a jury's finding of premeditation against a defendant's "insufficiency of the evidence" challenge. Seven of the special instruction's nine factors are of longstanding use in the sufficiency of the evidence arena and are well known to criminal lawyers in Tennessee as the *Bland* factors. *See Bland*, 958 S.W.2d at 660. The special instruction's two remaining factors, evidence of repeated blows or multiple wounds and the establishment of a motive

for the killing, are two of three additional factors that our Supreme Court recognized as sufficient to support a jury's finding of premeditation in *State v. Leach* 148 S.W.3d 52, 54 (Tenn. 2004). The use of various circumstantial premeditation factors identified and listed in *Bland* and *Leach* has been upheld by our Supreme Court as recently as *State v. Hester*, 324 S.W.3d 1, 58, 90 (Tenn. 2010). Each of the factors listed in the special instruction finds adequate support in the case law.

The defendant conceded that the special instruction was the language of the presently-existing law in Tennessee at the time it was issued and does not challenge the legal accuracy of the instruction here. Rather, the defendant claims that this special instruction was unnecessary, unfair, and prejudicial to the defense because it provided a "roadmap" that was relied on by the prosecution in its closing argument. In essence, because the prosecutor went point-by-point down the nine factors listed in the special instruction and listed its evidence with respect to each during its closing argument, the defendant claims that the trial court's decision to issue the special instruction was tantamount to providing an inappropriate "judicially sanctioned roadmap to guilt."

However, we do not agree with the defendant's characterization of the special instruction; this jury was not "unfairly instructed on the legal issues" within the meaning of *Cozart*. Each of the factors given in the special instruction was well rooted in the case law. The evident co-extensiveness between (1) the nine factors listed in the special instruction, and (2) the evidence presented by the prosecution at trial and summarized in its closing argument, emanates from the fact that this hapless defendant, in the course of committing this killing, somehow managed to leave behind evidence pertaining to virtually every circumstance that a jury might use to infer the fact that he did, in fact, premeditate this particular crime. Although the trial judge did omit from the special instruction's list one additional *Leach* factor – the use of multiple weapons in succession to accomplish the killing – for reasons that do not appear in the record, this omission does not strike us as unfairly prejudicial to the defense. No evidence suggested that the defendant used multiple weapons to accomplish his goal, and, consequently, a specific instruction listing this point was unnecessary to "more accurately define" the proposition of premeditation that had already been submitted to the jury. *See Cozart*, 54 S.W.3d at 245. We can discern no manner in which the defendant would have benefitted from the inclusion of this particular additional factor in the special instruction and, consequently, can discern no prejudice from its omission.

In summary, we reject the defendant's argument and hold that the trial judge's decision to issue a special instruction specifying some of the *Leach* and *Bland* factors did not unfairly instruct the jury or otherwise unfairly prejudice the defense. However, legal challenges to special instructions detailing various *Leach* and *Bland* factors have arisen

before, and strong language in *State v. Brandon Compton*, No. E2005-01419-CCA-R3-CD, 2006 Tenn. Crim. App. LEXIS 790, at *18-26, is worth revisiting today. The *Compton* panel reversed a conviction for first degree murder on sufficiency of the evidence grounds, holding that the State failed to present adequate evidence of premeditation. *Id.* at *7-19. After doing so, the panel engaged in an extended discussion in *dicta* in which it criticized the trial judge's use of a special premeditation instruction (almost identical to the one used in this case) that specified seven *Bland* factors and the additional *Leach* factor concerning the infliction of multiple blows. *Id.* at *18-26. The panel explained in detail that many of these premeditation factors, and others not listed in the instruction, had developed their own body of case law, which in some cases limited the extent to which the factor could be used to support a finding of premeditation for sufficiency of the evidence purposes.

In its *Compton dicta*, the panel noted that an implication might be gleaned from our supreme court's decision in *Jackson* that declarations of an intent to kill must be directed toward a specific victim in order to support a jury finding of premeditation, citing *Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005) – a conclusion that we do not repeat today. *See Compton*, 2006 Tenn. Crim. App. LEXIS 790, at *23. However, when using evidence of the defendant's procurement of a weapon to support the evidentiary sufficiency of a jury's finding of premeditation, our supreme court *has* intimated that evidence of procurement alone may not suffice if no reasonable assumption can be drawn from that evidence that the weapon was procured *for use against the victim*. *See State v. Jackson*, 173 S.W.3d at 410 n.5. With respect to evidence pertaining to the *Bland* factor concerning a defendant's efforts to conceal the crime, it has been held (as the trial judge properly instructed here) that such evidence must show at least some concealing activity predating the commission of the murder before concealing activity alone will support a jury finding of premeditation. *See*, *e.g.*, *State v. West*, 844 S.W.2d 144, 138 (Tenn. 1992); *State v. Long*, 45 S.W. 3d 611, 621 (Tenn. Crim. App. 2000). In addition, some of the individual *Bland* and *Leach* factors, standing alone, are not sufficient to support a jury finding of premeditation and must instead be used in conjunction with other factors or evidence. These factors include the infliction of multiple wounds, *State v. Brown*, 836 S.W.2d 530, 542 (Tenn. 1992), and the use of a deadly weapon against an unarmed victim, *State v. Tune*, 872 S.W.2d 922, 925 (Tenn. Crim. App. 1993); *Meazel v. State*, 500 S.W.2d 627, 629 (Tenn. Crim. App. 1973).

In *Compton*, the panel elected in *dicta* to caution trial judges in the strongest possible terms that this court could consider any instruction listing one or more individual *Bland* or *Leach* factors without also referencing legally-important limitations on the use of those factors to be legally incomplete. *Compton*, 2006 Tenn. Crim. App. LEXIS 790, at *24. Although the function of a jury instruction is not to raise the jury's awareness of the governing law to the level of that of judge or a lawyer, instructions that are incomplete in a legal sense may be found to be inaccurate and misleading to the jury within the meaning of

*Cozart. See id.* While we elect not to repeat some of the more strident language of the *Compton dicta* regarding the misleading nature of these sorts of special instructions at this time – preferring instead to await a case that categorically establishes our jurisdiction and squarely presents the issue for legal resolution – we do again caution trial judges that the safer practice may be to simply rely on the pattern jury instructions. If a trial judge should find it necessary to diverge from the pattern instructions on the premeditation issue, and decide to issue a special instruction detailing some or all of the *Bland* or *Leach* factors, the more cautious approach would be to include appropriate lay language regarding each factor specified in such an instruction, discussing any legal limitations that might be helpful to the jury in reaching an accurate understanding of the law and a correct resolution of the premeditation issue.

In the case before us, the defendant did not challenge the legal accuracy of the special instruction at trial, in his motion for new trial, or on appeal. To the contrary, the defendant specifically assured the trial judge that instruction at issue – while unnecessary, inappropriate, and unfair – was "the language of the law as it exists in Tennessee at this time." Consequently, we have little difficulty concluding that any claim that the special instruction was so devoid of legal accuracy as to affirmatively mislead the jury has been waived. *See* Tenn. R. App. P. 3(e).

We may, of course, exercise our discretion to consider a waived error that affects the substantial rights of an accused. Tenn. R. Crim. P. 52(b). However, to perform such a review, the error must, *inter alia*, breach "a clear and unequivocal rule of law." *State* v. *Adkisson*, 899 S.W.2d 626, 641 (Tenn. Crim. App. 1994). Because the legality of the giving of a jury instruction specifying individual *Bland* or *Leach* premeditation factors without making any reference to their individual legal limitations in the sufficiency of the evidence arena has been addressed by this court only in *dicta,* we may not ultimately hold that it constitutes reversible error, especially in all situations or in all contexts. Consequently, the giving of any such instruction at the time of the defendant's trial did not violate any established law and certainly did not constitute a breach of the "clear and unequivocal rule of law," which is necessary for us, in our discretion, to consider the issue *via sua sponte* plain error review.

III.

The defendant raises three separate points of error concerning the trial court's admission of evidence. He contends the trial court erred in (1) allowing a police officer to testify that smudges found on the victim's window were likely caused by the shooter pressing his face against it to listen for movement, (2) admitting the murder weapon into evidence, and (3) limiting the testimony of the defendant's mother. We disagree.

-8-

The admission of evidence challenged in the present case is entrusted to the broad discretion of the trial court, and as such, a trial court's ruling on the admission of evidence may only be disturbed upon a showing of an abuse of that discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004) (citing *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997)). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *Id.* (*quoting State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997)). All relevant evidence is admissible unless a particular constitutional provision, statute, or rule excludes it. Tenn. R. Evid. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading to the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The defendant first contends that the trial court erred in allowing a police officer to testify that: (1) certain distinctive smudges found on the victim's window appeared to be a face and ear print, and (2) if so, it was his opinion that the shooter had pressed his or her face against the window to try to see a silhouette or hear if anyone was inside the room beyond. At trial, the defendant objected to this testimony as speculative. On appeal, he further specifies that this testimony constituted improper opinion testimony from a lay witness, urging that the jury could have reached its own conclusion regarding whether someone had been looking through the window without any need to resort to the officer's testimony.

Tennessee Rule of Evidence 701 states that "[i]f a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." One well-established type of permissible lay opinion testimony is in a situation in which the "opinion" testimony is the only practical way the facts may be clearly described to the jury. "When facts perceived by the [layperson's] senses are numerous and it is difficult to describe them in an adequate manner to the jury, and at the same time the conclusion or inference to be drawn from such facts is simple and well within the range of common experience and the witness can relate what he has seen more accurately, as well as more easily, by stating his conclusion than by attempting to detail the evidential facts, the conclusion or inference is properly admitted." *National Accident & Life Insurance v. Follett*, 80 S.W.2d 92, 98 (Tenn. 1935) (permitting lay opinion testimony that a disturbed spot in the snow appeared to be a "place that looked like someone had slipped."). After reviewing the record (including photos of the crime scene), we find that the first portion of the officer's challenged testimony easily

fits within this category of permissible lay opinion testimony; anyone describing the state of the smudged window of the victim's apartment would have significant difficulty doing so without simply stating that it looks exactly like what one would expect to observe if someone had pressed their face and their ear against the glass.

Given that it was permissible for the officer to opine that the smudges were caused by someone pressing their face and their ear against the glass, we cannot find that the trial court committed any error by permitting the officer to continue to opine that these smudges were probably caused by the shooter pressing his or her ear against the glass to see if he or she could hear someone in the room beyond, and pressing his or her face against the glass to determine if he or she could make out a silhouette. This logical conclusion was rationally reached by the officer based on his perceptions of the crime scene as a whole, including the nature and appearance of the smudges on the window, the height of the smudges, the placement of the smudges in relation to the bullet holes in the glass, the trajectory of the bullets, the state of the bedroom at the time of the crime, and the placement of the spent shell casings later recovered by the police. Moreover, this particular conclusion may have been helpful to the jury in determining an important issue. Although it is likely that the jury could understand each of these facts separately, without the opportunity to view the crime scene themselves, the jury might had some difficulty connecting these individual facts to reach a proper understanding of the officer's testimony regarding the way in which it appeared that the shooter had stalked and targeted the victim – an important factor bearing on the resolution of the premeditation issue. As lay testimony, rationally based on the officer's perceptions, which was potentially helpful to the jury in resolving the premeditation issue, the trial court's admission of the officer's testimony complied with Rule 701.

Next, the defendant argues that the trial court erred when, at the close of the testimony of one of the State's witnesses, it brought to the State's attention that the murder weapon (Exhibit 10) might still have been marked for identification purposes only. The State immediately moved to enter the weapon into evidence, and the trial court admitted the weapon over the objection of the defendant. This did not constitute error.

The defendant's argument on this subject is tantamount to a complaint that he was not allowed to unfairly capitalize on what might have eventually become an extremely important technical legal error committed by the State. If the State had continued, completed the remainder of its case, and had rested without ever entering the murder weapon into evidence, this technical mistake might have resulted in a tremendous windfall to the defendant. However, even under these circumstances, the trial court might have properly exercised its discretion to reopen the State's proof and allow the admission of the murder weapon. *See, e.g., Oliver v. State*, 348 S.W.2d 325, 327 (Tenn. 1961) (explaining that trial courts possess broad discretion concerning whether or not to permit reopening of a case for further proof).

In the present case, the State had not even rested its case prior to moving to have the murder weapon admitted, and therefore the trial court possessed even broader discretion concerning its admissibility. After carefully reviewing the record, we conclude that all that actually occurred in the court below is that, after being informed by the trial judge that a particular trial exhibit may have been marked for identification purposes only, the State moved to have that exhibit entered into evidence. The trial court was well within its discretion to admit that exhibit, and consequently the defendant is not entitled to relief.

Third, the defendant argues that the trial court erred in limiting the testimony of the defendant's mother. The defendant moved in the court below that his mother be allowed to testify that (1) the victim was a wild woman; (2) she thought the victim's nephew posed a danger to the defendant; and (3) the defendant told her that although he killed the victim, "he was not trying to." The trial court ruled that the mother's testimony was irrelevant with respect to the first two subjects, and that the third subject constituted inadmissible hearsay.

On appeal, the defendant argues that his mother's detailed testimony regarding various statements he made to her, which might loosely collectively be described as a "confession," should be admissible because the State "opened the door" to this testimony when it disclosed that the defendant's mother had notified police that her son had told her that he was responsible for the victim's death. It is true that, in Tennessee, "if a party opens the door for admission of incompetent evidence, he is in no plight to complain that his adversary followed through the door thus open." *Spadafina v. State*, 77 S.W.3d 198, 213 (Tenn. Crim. App. 2000) (*quoting Thomas v. State*, 113 S.W. 1041, 1042, (Tenn. 1908)). The doctrine of curative admission is based on fundamental fairness and is intended to prevent a party from gaining unfair advantage by manipulating the rules of evidence in such a way as to leave the jury with unfair or improper feelings about the case. *State v. Land*, 34 S.W. 3d 516, 530-31 (Tenn. Crim. App. 2000). "[T]he doctrine's ability is limited by, 'the necessity of removing prejudice in the interest of fairness.'" *Id.* at 531 (*quoting Crawford v. United States*, 198 F.2d 976, 979 (D.C. Cir. 1952)). "Only . . . evidence which is necessary to dispel unfair prejudice" may be introduced through this rule. *Id.*

In the case at bar, even assuming that the defendant's claim has been properly preserved for our review, we can discern no evidence in the record that was introduced by the State that may have unfairly prejudiced the defendant. At trial, the State did not introduce any of the actual content of the defendant's "confession" to his mother. Rather, some of the State's law enforcement witnesses referenced the fact that they had received a phone call from the defendant's mother in which she stated that he had acknowledged responsibility for the killing as the reason that they chose to continue their investigation of the defendant as a suspect. Commentary regarding the confession at this level of abstractness would leave the jury with no impression one way or another regarding whether the crime was premeditated.

-11-

An individual can be said to be "responsible" for someone's death by killing them in either a premeditated or unpremeditated manner – or for that matter, even by causing their death with some level of intent below that necessary to establish murder.

Because the broad references made in the defendant's confession to his mother did not leave the jury with the impression that the murder was premeditated, no curative admission of otherwise inadmissible contrary evidence was necessary to combat any adverse inference that might have been made against the defendant. The broad statements introduced by the State could not fairly be said to open the door to the considerably more detailed description of the defendant's "confession" proffered by his mother, in which the defendant allegedly made statements consistent with the idea that the killing was unplanned. The defendant is not entitled to relief on this issue.

IV.

In his final claim, the defendant argues that he is entitled to relief based on the cumulative effect of multiple trial errors. A combination of multiple otherwise harmless errors may necessitate the reversal of a conviction if it is more probable than not that they have affected the jury's verdict. *State v. Maddox*, 957 S.W.2d 547, 556-57 (Tenn. Crim. App. 1997). After careful review, we have rejected each of the defendant's claims and have found no errors that cast doubt on the reliability of the jury's verdict. Accordingly, the defendant is not entitled to relief on this issue.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE