FILED
05/23/2019
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 6, 2019 Session

# IN RE LENNON R.

**Appeal from the Juvenile Court for Rutherford County
No. 11756-C Donna Scott Davenport, Judge**

_____

## No. M2018-00541-COA-R3-JV

_____

This is an appeal from the trial court's order that: (1) designated Father/Appellee as primary residential parent; (2) awarded him sole decision-making authority; and (3) set visitation. Mother/Appellant appeals: (1) the designation of Father as primary residential parent; (2) the award of sole decision-making authority to Father; and (3) her number of parenting days with the child. Because the trial court failed to make any findings regarding decision-making authority, we vacate the trial court's award of sole decision-making authority to Father and remand for findings of facts and conclusions of law related to same. We also conclude that the trial court abused its discretion when it failed to maximize Mother's parenting time with the child. Therefore, we reverse the trial court's visitation award and remand for a more equal award of parenting time. Finally, we reverse the trial court's order concerning child support and remand for a recalculation of support consistent with the new parenting schedule entered on remand. The trial court's order is otherwise affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Reversed in Part; Vacated in Part; Affirmed in Part and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S. and ARNOLD B. GOLDIN, J., joined.

Donald Capparella, Nashville, Tennessee, for the appellant, Kendall R.[1]

Rebecca L. Lashbrook, Murfreesboro, Tennessee, for the appellee, Joshua R.

---

[1] We note that Mother's appellate counsel was not Mother's counsel at trial.

# OPINION

## I. Background

Lennon R. ("the Child") was born, in September 2015, to Kendall R. ("Mother" or "Appellant") and Joshua R. ("Father" or "Appellee").[2]  Mother and Father had a brief relationship but were never married.  Shortly after Mother and Father ended their relationship, Mother began dating another man.  Soon thereafter, Mother realized she was pregnant.  Mother claims that she believed that her boyfriend was the Child's father.  The Child's paternity was determined only after Mother's boyfriend took a paternity test, which excluded him as the Child's father.  After learning her boyfriend was not the father, Mother surmised that Joshua R. was the Child's father.  Mother testified that she did not have Father's contact information, but was able to locate his sister via social media.  Mother sent Father's sister a message on social media asking his sister to have Father contact her.  After Father failed to contact Mother, she sent a picture of the Child to Father's sister.  Soon thereafter, Father contacted Mother, and an at-home DNA test confirmed Joshua R. as the Child's father.

Father immediately sought parenting time with his then five-month-old daughter.  Without a written order in place, Mother gave Father parenting time with the Child, including a few overnights.  Then, sometime in February or March 2016, Father picked up the Child from Mother and was driving home when Mother called and asked Father for his address because she needed it for child support purposes.  Father, according to Mother's testimony, became very angry.  Father contends that Mother began asking him several questions, which he did not answer because he was driving.  Both parties agree that Mother told Father he could not keep the Child if he did not provide the information she sought.  Further, both parties agree that Mother threatened to call the police and allege that Father kidnapped the Child if he did not bring the Child back to her.  Upon hearing this threat, Father returned the Child to Mother.  Mother testified that, upon Father's return, he threw the Child at her while the Child was still in her car seat.  Days after this incident, Father texted Mother about seeing the Child, but Mother did not respond to his text.

On May 11, 2016, Father filed a Petition to Establish Paternity in the Juvenile Court for Rutherford County ("trial court").  Mother filed an answer on August 1, 2016.  On August 2, 2016, the trial court entered an order confirming Appellee's paternity and setting a temporary parenting plan.  The temporary parenting plan awarded Father visitation every other week from Monday at 10:00 a.m. until the following Monday at 10:00 a.m.  During Father's weekly visitation, the trial court awarded Mother each Wednesday from 8:30 a.m. until Thursday at 8:30 a.m.  Accordingly, the parties'

---

[2] In cases involving minor children, it is the policy of this Court not to use the full names of the parties in order to protect the children's identities.

parenting time was almost equal under the trial court's initial parenting plan with Mother receiving somewhat more time.

The trial court conducted a bench trial on Father's petition on June 27, 2017, December 14, 2017, and December 21, 2017. By order of February 26, 2018, the trial court, *inter alia*, named Father as the Child's primary residential parent, awarded Father sole decision-making authority, and awarded Mother visitation with the Child every other weekend. The Permanent Parenting Plan Order ("Parenting Plan") awarded Mother 100 days with the Child and awarded Father 265 days with the Child.[3] Mother appeals.

## II. Issues

We perceive that there are five issues Mother raises on appeal, which we state as follows:

1. Whether the trial court erred when it refused to consider evidence of Father's Driving under the Influence ("DUI") arrests that occurred prior to the Child's conception.

2. Whether the trial court erred when it mischaracterized evidence in the record.

3. Whether the trial court erred when it designated Father as the primary residential parent.

---

[3] We note that the trial court entered an Amended Permanent Parenting Plan Order on March 16, 2018. The original Parenting Plan, under "Day-to-Day Schedule," stated that

[t]he mother shall have responsibility for the care of the child except at the following times when the other parent shall have responsibility:

From Friday at 6:00 p.m. until Sunday at 6:00 p.m., beginning January 12, 2018.

The Amended Parenting Plan attempted to correct the error above but instead stated that

[t]he mother shall have responsibility for the care of the child except at the following times when the other parent shall have responsibility:

From Friday at 6:00 p.m. until Sunday at 6:00 p.m., **every other week**, beginning January 12, 2018.

(Emphasis in original). In view of the Parenting Plan (as a whole) and given Mother's appeal, we conclude that the first line of the Parenting Plan should read: "The ***father*** shall have responsibility for the care of the child except at the following times when the other parent shall have responsibility . . . ." (Emphasis added).

4. Whether the trial court erred when it awarded Father all major decision-making authority.

5. Whether the trial court erred when it failed to maximize Mother's parenting time.

## III. Standard of Review

"We review a non-jury case *de novo* upon the record with a presumption of correctness as to the findings of fact unless the preponderance of the evidence is otherwise." ***Tennessee Farmers Mut. Ins. Co. v. Debruce***, No. E2017-02078-COA-R3-CV, 2018 WL 3773912, at *3 (Tenn. Ct. App. Aug. 9, 2018) (citing Tenn. R. App. P. 13(d); ***Bowden v. Ward***, 27 S.W.3d 913, 916 (Tenn. 2000)). The trial court's conclusions of law are reviewed *de novo* and "are accorded no presumption of correctness." ***Brunswick Acceptance Co., LLC v. MEJ, LLC***, 292 S.W.3d 638, 642 (Tenn. 2008).

## IV. Analysis

### A. Father's Previous DUIs

Mother argues that the trial court erred when it barred her from questioning Father, on cross-examination, regarding two of his three DUI arrests, which occurred between May 2011 and November 2013 ("Kansas DUIs").[4] Father's counsel questioned Father on direct examination concerning his Kansas DUIs and Father testified to same. However, when Mother's counsel began questioning Father about the DUIs on cross-examination, Father's counsel objected, stating that the information was irrelevant because the DUIs predated the Child's conception. Mother's counsel argued that the Kansas DUIs were relevant to Father's character and ability to parent. The trial court sustained Father's objection and ruled that "anything prior to the birth of th[e] [C]hild [was] not relevant."

This Court has previously explained that

> Rule 401 of the Tennessee Rules of Evidence defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "In other words, evidence is relevant if it helps the trier of fact resolve an issue of fact." ***Howe v. Howe***, No. E2016-01212-COA-R3-CV, 2017 WL 1324177, at *4 (Tenn. Ct. App. Apr. 10, 2017) (citing Neil P. Cohen, et al., Tennessee Law of Evidence § 4.01[4], at 4-9 (5th ed. 2005)). "Evidence

---

[4] In addition to the Kansas DUIs, Father was arrested for a third DUI in Tennessee when Mother was pregnant. There is no proof that Father knew Mother was pregnant at the time of his third DUI. After the Tennessee DUI, Father participated in Veterans Treatment Court, discussion *infra*.

which is not relevant is not admissible." Tenn. R. Evid. 402. If the evidence is relevant, it is admissible unless otherwise excluded by law. *Id.*

Excluding relevant evidence is "an extraordinary step that should be used sparingly." *In re Envy J.*, No. W2015-01197-COA-R3-PT, 2016 WL 5266668, at *10 (Tenn. Ct. App. Sep. 22, 2016) (citations omitted). A trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. This rule requires trial courts to conduct a two-part balancing test. *Howe*, 2017 WL 1324177, at *4 (citing *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 227 (Tenn. Ct. App. 2002)). First, the trial court must "balance the probative value of the [challenged evidence] against the countervailing factors." *Id.* (citing *White*, 21 S.W.3d at 227). "After the court has engaged in the balancing analysis, it may then exercise its discretion to determine whether the evidence should be excluded if the prejudice substantially outweighs the probative value of the evidence." *Id.* (citing *White*, 21 S.W.3d at 227). The trial court is in the most suitable position to conduct this balancing test under Rule 403. *Id.*

*In re Angel M.*, No. E2016-02061-COA-R3-PT, 2017 WL 3228314, at *10 (Tenn. Ct. App. July 31, 2017). Trial courts are generally afforded a "wide degree of latitude" regarding decisions to admit or exclude evidence and will only be overturned on appeal where there was an abuse of discretion. *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1993) (citing *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 835 (Tenn. Ct. App. 1980); Tenn. R. Evid. 401; *Austin v. City of Memphis*, 684 S.W.2d 624, 634 (Tenn. Ct. App. 1984); *Inman v. Aluminum Co. of America*, 697 S.W.2d 350, 354 (Tenn. Ct. App. 1985)). The trial court abuses its discretion when it applies the incorrect legal standard or reaches a decision that is clearly unreasonable. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). "Although the discretionary nature of the decision does not shield it completely from appellate review, it does result in less rigorous appellate scrutiny." *In re Envy J.*, 2016 WL 5266668, at *6 (citing *White*, 21 S.W.3d at 222 (citations omitted)).

We conclude that the trial court abused its discretion when it refused to allow Mother's counsel to cross-examine Father concerning his Kansas DUIs. First, information regarding a parent's history with alcohol and the decisions that parent makes when consuming alcohol is certainly probative in a child custody proceeding because such evidence goes to a parent's decision-making skills, which affect his or her ability to parent. *See In re Price v. Price*, No. 02A01-9609-CH-00228, 1997 WL 338588, at *7 (Tenn. Ct. App. June 20, 1997) ("DUI is a serious offense that shows a lack of judgment on [the parent's] part."). Here, the probative value in hearing evidence regarding Father's

previous DUIs is not "outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Therefore, such evidence would have been relevant to the current proceeding.

Lastly, Father "opened the door" to such testimony when he testified regarding his Kansas DUIs on direct examination. "Tennessee has long recognized a 'good-for-the-goose, good-for-the-gander' rule that 'if a party opens the door for the admission of incompetent evidence, he is in no plight to complain that his adversary followed through the door thus opened; and this, although no objection was made in the first instance to the admission of such evidence.'" *Ray v. Richards*, No. M2000-01808-COA-R3-CV, 2001 WL 799756, at *4 (Tenn. Ct. App. July 17, 2001) (quoting *Spadafina v. State*, 77 S.W.3d 198, 213 (Tenn. Crim. App. 2000) (quoting *Thomas v. State*, 113 S.W. 1041, 1042 (1908); *see also* *Garrison v. State*, 40 S.W.2d 1009, 1013 (1931))). Consequently, because Father introduced the issue, he cannot oppose cross-examination on same.

Although we conclude that the trial court erred in preventing Mother's counsel from cross-examining Father concerning his Kansas DUIs, under Tennessee Rule of Appellate Procedure 36(b), "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Although, for the reasons discussed above, the trial court should have overruled Father's objection, any error was harmless because the fact of Father's DUIs was already in the record based on his answers during direct examination. Therefore, we cannot conclude that the trial court's error in denying Mother an opportunity to question Father further concerning his Kansas DUIs more probably than not affected the judgment or resulted in prejudice to the judicial process. As such, this error does not require reversal.

## B. Permanent Parenting Plan

Mother also argues that the trial court erred when it: (1) designated Father as the Child's primary residential parent; (2) awarded Father sole major decision-making authority; and (3) dramatically reduced her parenting time with the Child. Before addressing these issues, we first address Mother's contention that the trial court erred in finding her testimony and her witness's testimony less credible than Father's testimony and that of his witnesses. Specifically, Mother alleges that the trial court made several adverse credibility findings against her without specifying its reasoning. In *Wells v. Tennessee Board of Regents*, 9 S.W.3d 779 (Tenn. 1999), the Tennessee Supreme Court explained that

> trial courts are able to observe witnesses as they testify and to assess their demeanor, which best situates trial judges to evaluate witness credibility.

*See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990); *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. Ct. App. 1991). Thus, trial courts are in the most favorable position to resolve factual disputes hinging on credibility determinations. *See Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); *Mitchell v. Archibald*, 971 S.W.2d 25, 29 (Tenn. Ct. App. 1998). Accordingly, appellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary. *See Humphrey v. David Witherspoon, Inc.*, 734 S.W.2d 315, 315-16 (Tenn. 1987); *Bingham v. Dyersburg Fabrics Co., Inc.*, 567 S.W.2d 169, 170 (Tenn. 1978).

*Wells*, 9 S.W.3d at 783. The trial court found "that [] Father and his witnesses [had] greater credibility than that of [] Mother or her witnesses." The trial court did not expand on its reason for the credibility finding. Certainly, the better practice would have been for the trial court to explain the reasons for its credibility finding; however, we acknowledge that such findings often rest on obscure considerations. As such, we usually defer to the trial court concerning its findings on credibility. Nonetheless, even if we assume, *arguendo*, that Mother, Father and their respective witnesses were equally credible, for the reasons discussed below, the evidence does not weigh against the trial court's designation of Father as the Child's primary residential parent.

Concerning the trial court's fashioning of a custody arrangement for the parties' child, Tennessee Code Annotated section 36-6-106(a) provides, to-wit:

> [i]n a suit for . . . divorce . . . or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in this subsection (a), the location of the residences of the parents, the child's need for stability and all other relevant factors.

Tenn. Code Ann. § 36-6-106(a).

In *Maupin v. Maupin*, this Court explained the standard of review applicable to a trial court's determination of a permanent parenting plan, to-wit:

> The paramount concern in establishing a permanent parenting plan is the best interest of the children. *See* Tenn. Code Ann. § 36-6-401(a). The details of permanent parenting plans are typically left to the discretion of trial courts; thus, the ultimate question as to who should be the primary residential parent on appeal is whether the trial court abused its discretion

in its selection. ***K.B.J. v. T.J.***, 359 S.W.3d 608, 613, 616-17 (Tenn. Ct. App. 2011). The trial court's discretion is not unbounded. ***Id***. at 616. In choosing the primary residential parent, the court engages in a "comparative fitness" analysis. ***In re C.K.G.***, 173 S.W.3d 714, 732 (Tenn. 2005). The court is obligated to consider all of the relevant factors listed in Tenn. Code Ann. § 36-6-404(b). "It is our job in reviewing for an abuse of discretion to see that the trial court's order is made with due regard for controlling law and based on the facts proven in the case." ***K.B.J.***, 359 S.W.3d at 616. Thus, if the evidence preponderates against the trial court's findings of fact upon which it bases it[s] determination, or simply focuses on facts which should not really matter while ignoring those that really do matter, the court may be found to have abused its discretion. ***Id***. A slightly different way of phrasing the abuse of discretion standard is that "[a] trial court fails to exercise its discretion properly when its decision is not supported by the evidence, when it applies an incorrect legal standard, [or] when it reaches a decision which is against logic or reasoning that causes an injustice to the party complaining." ***Owens v. Owens***, 241 S.W.3d 478, 496 (Tenn. Ct. App. 2007) (citing ***Biscan v. Brown***, 160 S.W.3d 462, 468 (Tenn. 2005)). Where the trial court makes specific findings of fact, we presume those findings to be correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); ***K.B.J.***, 359 S.W.3d at 613.

***Maupin v. Maupin***, 420 S.W.3d 761, 770 (Tenn. Ct. App. 2013), *perm. app. denied* (Tenn. Oct. 16, 2013). Tennessee Code Annotated section 36-6-106(a) provides a list of factors a trial court should consider in fashioning a custody arrangement. Tenn. Code Ann. § 36-6-106(a). As set out in its order, the trial court made findings concerning several of the statutory factors. We will review each of the factors, on which the trial court relied, against the record to determine whether the trial court erred in fashioning the Parenting Plan.

## 1. Best Interest Analysis

The first statutory factor concerns "[t]he strength, nature, and stability of the child's relationship with each parent, including whether one (1) parent has performed the majority of parenting responsibilities relating to the daily needs of the child." Tenn. Code Ann. § 36-6-106(a)(1). Regarding this factor, the trial court made the following findings:

> As to the first factor, the [c]ourt finds that [] Father has been a "hands-on father" since his knowledge of the minor child, although parenting time has not been equal between the parties. The [c]ourt finds that both parents have taken the [C]hild for medical care. Therefore, the [c]ourt finds equally for the parents.

The record demonstrates that both parties have been actively involved in the Child's life and that the Child is bonded with both parents. The record shows that Mother performed the majority of parenting responsibilities for the first eleven months of the Child's life and had somewhat more time with the Child under the trial court's temporary parenting plan. The record also demonstrates that Father has been a very attentive and stable force in the Child's life since the trial court entered the temporary parenting plan. Therefore, we conclude that the trial court did not abuse its discretion in finding that this factor weighs equally in favor of both parents.

Factor two requires the trial court to consider:

Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order[.][5]

Tenn. Code Ann. § 36-6-106(a)(2). Concerning this factor, the trial court found, in relevant part, that

. . . Mother withheld the [C]hild from [] Father after beginning parenting time between [] Father and minor child at issue, impeding the relationship. Mother further testified that she does not believe that she can co-parent with [] Father. Nonetheless, [] Father has continued to be involved. [] Father brought this action, and [] Mother ignored service of process in this action until [] Father filed an action for default or for parenting time; showed up late for parenting exchanges; failed to provide for the [C]hild's medical needs; provided dirty child supplies at visitation exchanges; and her lack of credi[bility], as well as her shows of aggression throughout these proceedings. Therefore, the [c]ourt finds in favor of [] Father.

---

[5] Tennessee Code Annotated section 37-5-501(b)(1) defines "caregiver" as follows: "'Care giver,' 'care givers,' 'care provider,' or 'care providers' mean the person or persons or entity or entities responsible for providing for the supervision, protection and basic needs of the child." Tenn. Code Ann. § 37-5-501(b)(1); Tenn. Code Ann. § 36-6-106(c) ("As used in this section, 'caregiver' has the meaning ascribed to that term in § 37-5-501.").

With regard to this factor, it appears the trial court made adverse findings against Mother regarding her: (1) willingness and ability to facilitate and encourage a close and continuing parent-child relationship between the Child and Father; and (2) her past and potential future performance of parenting responsibilities.

Turning to the record, prior to the entry of a court order regarding visitation, Mother refused to let Father see the Child after an altercation with Father that occurred towards the end of February/beginning of March 2016. Specifically, Mother stated that Father "got in [her] face and shook his fist" at her. She testified that Father made her feel "kind of belittled and that [she] had to protect [her] child." Mother further testified that it was difficult to co-parent with Father. When asked by her counsel what complaints she had about Father, Mother responded: "We just can't co-parent. . . . I try, and it's just not possible. . . . I think that he's . . . kind of set in his ways and thinks he knows everything . . . ." However, Mother's actions demonstrate that, despite the problems, she has attempted to co-parent with Father. She testified that she texts Father in an attempt to communicate with him regarding the Child. The evidence also shows that Mother has shared information concerning the Child such as the name of the Child's pediatrician and an allergy the Child had as an infant. Importantly, Mother also testified that she wants Father to be involved in the Child's life, and there was no evidence that Mother has ever denied Father his parenting time in violation of a court order. Finally, while it is true that Mother did not respond to Father's petition until Father filed an action for default, she fully participated in these proceedings after she was able to retain an attorney. The trial court made no findings with regard to Father's willingness to facilitate and encourage a close and continuing parent-child relationship between the Child and Mother; however, Father testified that he was willing to co-parent with Mother, and the record clearly establishes that Father has exercised his parenting time under the temporary parenting plan.

The trial court implicitly found that Mother's past and potential future performance of parenting responsibilities were inferior to Father's. In reaching its conclusion, the trial court focused on four pieces of evidence. First, Father testified that Mother is fifteen-to-twenty minutes late to exchanges about "70ish percent" of the time. Second, Father entered, as an exhibit, pictures of the Child with rashes and bug bites on her body and testified that Mother failed to provide the appropriate medical care for the Child. With regard to the "dirty child supplies at visitation," Father entered, as an exhibit, pictures of clean and dirty baby bottles. Father testified that he received the dirty bottles from Mother after an exchange; Mother, however, testified that she never gave Father bottles that were dirty.

While Father's evidence is persuasive, there is also ample evidence that Mother is capable of performing her parental responsibilities. Mother was the Child's sole caretaker and provider for the first eleven months of the Child's life. Also, the testimony from both Father and Ryan D., the father of Mother's other child, demonstrate that

- 10 -

Mother has provided a stable and loving home for both of her children. There is no evidence that the Child is malnourished, abused or neglected while in Mother's care. We also note that the trial court appeared to contradict itself in its findings. The trial court found that "both parents have taken the [C]hild for medical care" when it made findings with regard to the first factor in Tennessee Code Annotated section 36-6-106(a)(1), but it went on to conclude (under this statutory factor) that Mother "failed to provide for the [C]hild's medical needs." From our review, the evidence preponderates against the trial court's conclusion that Father is a better caretaker than Mother. We conclude from the proof in the record that this factor weighs equally in favor of both parents.

The trial court made no findings concerning Father's past and potential future performance of parenting responsibilities. However, the record demonstrates that Father is a responsible and capable parent but that he also has faults. For example, Father has three DUIs. As discussed, *supra*, this evidence demonstrates a lack of judgment on Father's part. Further, Father testified that he smoked marijuana in his backyard three weeks before the trial in this matter. This also shows a lack of judgment on his part. Nonetheless, the majority of the evidence demonstrates that Father is a responsible parent; he completed Veterans Treatment Court for his most recent DUI, and he testified that he does not smoke marijuana regularly and never in the presence of the Child.

The evidence demonstrates that both parents are good and capable caregivers who are trying to facilitate and encourage close bonds between the Child and the other parent. From the totality of the circumstances, we conclude that the evidence does not support the trial court's finding that this factor weighs in Father's favor; we conclude that it weighs equally for both parents.

Concerning statutory factor four, "[t]he disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care," Tenn. Code Ann. § 36-6-106(a)(4), the trial court stated:

> Mother has provided the majority of routine care, as she was the primary parent by statutory scheme. However, the [c]ourt finds that [] Father has taken the child to walk-in appointments immediately following parenting exchanges; testimony that [] Mother failed to follow up with prescription care for the minor child; but both parents provided clothing and food for the minor child. However, the [c]ourt finds in favor of [] Father as to this factor.

The record demonstrates that Mother provided the majority of routine care for the Child in the past and that both Mother and Father have provided food, clothing, and medical care for the Child. However, it also demonstrates that, at times, Mother has underestimated the Child's need for medical treatment. Father testified that there were a few times immediately after exchanges when he would take the Child to a walk-in clinic

- 11 -

because of rashes or bug bites on her skin. Father testified that he discussed these issues with Mother, but Mother appeared to underestimate the seriousness of the issues. Father, through trial Exhibit 5, provided pictures of the Child's skin during these incidents. Father testified that, at one of these appointments, the Child was prescribed a steroidal ointment for her skin and an antibiotic. When the Child returned to Mother, Mother stopped giving the Child the steroidal ointment against medical advice. Father testified that, on another occasion, he took the Child to the doctor immediately following an exchange because the Child had severe bug bites on her skin. At that visit, Father was informed that the Child also "had a pretty bad yeast infection and a double ear infection." When asked about these incidents at trial, Mother stated that "babies get rashes" and that the Child had spent a lot of time outside during the summer, which explained the bug bites. Mother also testified that she took the Child to the doctor for rashes "[i]f [she] felt it needed to be seen" but continued that rashes "will come and go." On cross-examination, Mother testified that she believed Father was being overly cautious when he took the Child to the doctor for the bug bites and rashes. From the totality of the circumstances, we conclude that the evidence supports the trial court's finding that this factor weighs in Father's favor.

Statutory factor five relates to "[t]he degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities." Tenn. Code Ann. § 36-6-106(a)(5). The trial court found equally for both parents. "Best interest factor . . . (5) require[s] the court to consider the extent of each party's parenting involvement prior to the [custody proceeding]." *Brown v. Brown*, No. E2017-01348-COA-R3-CV, 2018 WL 4182292, at *9 (Tenn. Ct. App. Aug. 30, 2018), *perm. app. denied*, (Tenn. Jan. 18, 2019). While it is true that both parties have been actively involved in the Child's life, the record demonstrates that Mother has been the Child's primary caregiver since the Child's birth. Mother was the primary caregiver for the first eleven months of the Child's life. The trial court also made this finding regarding Mother's care when it entered the temporary parenting plan in August 2016.

From the trial court's holding, it is clear that the trial court did not give sufficient credit to Mother for the period in which she was the Child's sole caretaker. As in *Brown*, "[t]he trial court erred by only considering the parties' division of parenting responsibilities since the temporary parenting plan took effect; the court should have taken a more holistic approach." *Brown*, 2018 WL 4182292, at *10. Additionally, the temporary plan awarded Mother more time with the Child than Father. Therefore, even after the temporary parenting plan was in place, Mother was still the Child's primary caretaker. Accordingly, we conclude that the trial court abused its discretion in finding this factor weighed equally in favor of both parties. From our review, we conclude that this factor favors Mother.

The sixth statutory factor concerns "[t]he love, affection, and emotional ties

- 12 -

existing between each parent and the child." Tenn. Code Ann. § 36-6-106(a)(6). The trial court found that

> both parties love the minor child. However, the [c]ourt heard no testimony that [] Mother even inquired into a more traditional work week, allowing her evenings or weekends with the minor child, outside of employing babysitters during her parenting time. Therefore, the [c]ourt gives greater weight to [] Father as to this factor.

We are unsure how a lack of testimony regarding a parent's inquiry concerning a different work schedule relates to "the love, affection, and emotional ties existing between each parent and the child." The record demonstrates that both parents love the Child very much, and that both parents are very bonded with the Child. Accordingly, the trial court erred in finding that this factor weighed in Father's favor, and we conclude that it weighs equally for both parents.

As to the seventh statutory factor, i.e., "[t]he emotional needs and developmental level of the child," Tenn. Code Ann. § 36-6-106(a)(7), the trial court found that this factor weighs in favor of Father. Specifically, the trial court stated:

> The [c]ourt heard testimony from [] Father and his witnesses as to his interactions with the [C]hild, educational and emotional assistance, as well as discipline, including family support. [] Mother's witness, Ryan [D.], testified that he is rarely in [] Mother's home. Therefore, the [c]ourt gives greater weight to [] Father as to this factor.

There is no proof in the record regarding the Child's emotional needs or her developmental level. Therefore, we conclude that the trial court erred in finding that this factor weighed in Father's favor when no evidence regarding the factor was proffered at trial.

Concerning factor eight, i.e., "[t]he moral, physical, mental and emotional fitness of each parent as it relates to their ability to parent the child," Tenn. Code Ann. § 36-6-106(a)(8), the trial court found:

> While [] Mother and her attorney asserted [] Father's disabilities, the [c]ourt heard no proof that [] Father is unable to parent the minor child. However, [] Mother, from her own testimony, fails to comply with her insulin compliance as to her diabetes. Therefore, the [c]ourt gives greater weight to [] Father as to this factor.

The trial court's characterization of Father's disabilities and Mother's diabetes is slightly skewed based on the evidence in the record. Father was injured in a bike

- 13 -

accident in 2013, which resulted in Father sustaining severe, life-altering disabilities. Father testified at length regarding his disability status and the fact that Veterans Affairs labeled him as one hundred percent (100%) disabled. He testified that he cannot hold a job due to his disability. He also testified that he has certain physical limitations as a result of the accident. He stated that he is currently undergoing psychiatric care from the Veterans Administration as a result of the accident but that he sees a counselor "on [his] own accord." Nevertheless, Father and his witnesses testified that his disabilities do not prevent him from being able to parent the Child.

Similarly, Mother testified that she has a chronic condition, Type 1 diabetes, which she has had for twenty-three (23) years.[6] Mother testified that she manages her diabetes with insulin that she takes "about five times a day." In finding that mother fails to comply with her insulin regimen, the trial court mischaracterized an incident where Mother was unable to drive to an exchange. Concerning this incident, Mother testified in pertinent part:

> **Q.** Okay. And, in fact . . . you were unable to get to a visitation exchange because -- because of the diabetes issues?
>
> **A.** Yes, ma'am. My health and my children come before anything else. Me -- before me getting on the road and having to be somewhere at a certain time, my sugars have to be at a certain level. And in order for me to safely get my daughter -- or our daughter, as I should say, to him and in the appropriate manner, my sugars have to be up in order for me to be able to make it safely there and back home and for my daughter to get there safely. . . . I could have left when I woke up that morning to be able to get her there on time, but we probably would have crashed. The chances of me crashing when my sugars are low is pretty high.

Instead of giving Mother credit for knowing the limitations of her chronic condition and for making the conscious decision to not drive and put herself and her children in danger, the trial court instead found that Mother "fail[ed] to comply with her insulin compliance as to her diabetes."[7] After reviewing the record, we conclude that the evidence does not support the trial court's finding regarding Mother's diabetes. In fact, there is no proof that the foregoing incident was the result of Mother's non-compliance with her insulin regimen. Based on the record, we conclude that both parties suffer from physical limitations; however, each party understands and regularly manages the limitations in a way that does not affect his or her ability to parent the Child. From the totality of the

---

[6] Mother testified that she was diagnosed with Type 1 diabetes when she was seven years old.

[7] A person with diabetes may experience hypoglycemia or "insulin shock" even if he or she is fully compliant with their doctor's orders and doing all he or she can to manage the diabetes. *See **Insulin Shock and Insulin Reactions***, WEBMD, https://www.webmd.com/diabetes/guide/diabetic-shock-and-insulin-reactions#1 (last visited May 10, 2019).

circumstances, the evidence does not support the trial court's finding that this factor weighs in Father's favor; we conclude that it weighs equally for both parties.

Statutory factor nine requires the trial court to consider "[t]he child's interaction and interrelationships with siblings, other relatives and step-relatives, and mentors, as well as the child's involvement with the child's physical surroundings, school, or other significant activities." Tenn. Code Ann. § 36-6-106(a)(9). With regard to this factor, the trial court found

> that the minor child has a five-year-old sibling in [] Mother's home, and has substantial exposure to a twelve-year-old child in [] Father's home. Additionally, [] Father provided testimony from the [C]hild's step-mother, paternal grandfather and William [K.].[8] [] Mother provided testimony from [Ryan D.]; however, he is not consistently involved with [] Mother or the minor child. Therefore, the [c]ourt [gave] greater weight to [] Father as to this factor.

From the record, it is clear that both of the Child's half-siblings love and adore her, and the Child reciprocates those feelings. Mother testified that she lives alone and does not have any family in Tennessee but that she has a good support system in her network of friends. Father lives with his wife, Taryn R., who testified that she is bonded with the Child and treats her like she would treat her own child. The paternal grandfather testified that he sees Father and the Child about once a week on Sundays after church when Father, Taryn R., and the Child come over for family dinners. We conclude that the evidence supports the trial court's finding that this factor weighs in Father's favor because the Child has more interactions and relationships with relatives on Father's side of the family.

Concerning factor ten, i.e., "[t]he importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment," Tenn. Code Ann. § 36-6-106(a)(10), the trial court found that "both parties have been consistent and stable in the [C]hild's life" and weighed this factor equally between both parents. As discussed, *supra*, both parents have been stable forces in the Child's life. Therefore, we conclude that the trial court did not abuse its discretion in finding that this factor weighs equally for both parents.

The twelfth statutory factor concerns "[t]he character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child." Tenn. Code Ann. § 36-6-106(a)(12). With regard to this factor, the trial

---

[8] William K. was Father's mentor with the Veterans Treatment Court. He testified that he has observed Father with both of his children and that Father is a very decent person who has a great relationship with his children.

court found:

> that [Mother] offered no testimony as to individuals who regularly frequent [] Mother's home, as [Ryan D.] only rarely comes to [] Mother's residence. [] Father offered witnesses as to his relationship with the [C]hild on a regular basis. Given the credibility issues weighing in favor of [] Father and his witnesses, the [c]ourt gives greater weight in this factor as to [] Father.

The trial court erred in its interpretation of this statutory factor. This factor addresses the Child's interactions with other individuals, who reside in or frequent the parents' homes; it does not concern the parents' interactions with the Child. Further, the trial court's finding that "Mother offered no testimony as to individuals who regularly frequent [her] home" is not supported by the evidence. Mother testified that Elizabeth W. and Lucas C. are friends who frequent her home. Mother also testified that Ryan D. comes to her house but "not many other people at all." Mother testified that all three of these people are "really good people" with no criminal background or drug issues. There was no proof to dispute this testimony; however, Mother did not offer evidence regarding her friends' specific interactions with the Child.

The trial court found, and the record shows, that Father lives with his wife, Taryn R., who has a good relationship with the Child. Father also provided evidence that his parents frequent the house and have positive interactions with the Child. Both parties offered evidence that the Child is very bonded with her half-siblings. The record does not indicate that there are any individuals who frequent either parent's home that are of concern. From the totality of the circumstances, we conclude that the evidence supports the trial court's finding that this factor weighs in Father's favor but only because the Child is able to interact with more family members at Father's house.

The fourteenth statutory factor requires the trial court to consider "[e]ach parent's employment schedule, and the court may make accommodations consistent with those schedules." Tenn. Code Ann. § 36-6-106(a)(14). Regarding this factor, the trial court stated:

> The [c]ourt looks to the employment schedule of the parties. The [c]ourt heard no testimony that [] Mother inquired as to a more traditional schedule, allowing her time with the minor child during the evenings or weekends. [] Father is not employed outside of the home, and does not employ a babysitter. Therefore, the [c]ourt gives greater weight to this factor to [Father].

Mother testified that she is a waitress at Golden Corral. Her work schedule at the time of trial was: Monday night from 4:00 p.m. to 9:00 p.m.; Tuesday night from 4:00 p.m. to

- 16 -

8:00 p.m.; Saturday and Sunday from 9:00 a.m. until 4:00 p.m. or 5:00 p.m. Mother testified that the Child is looked after by a babysitter on days when she works. There was no testimony regarding Mother changing her work schedule to allow more time with the Child during Monday or Tuesday evenings or on the weekends. Conversely, due to his disability, Father is unable to work and can be home with the Child any time. Based strictly on Father's ability to be flexible in his schedule, we conclude that the evidence supports the trial court's finding that this factor weighs in his favor.

## 2. Primary Residential Parent

As discussed, *supra*, the trial court made some errors in its best interest analysis. Following our review, we conclude that most of the factors weigh equally between the parents; however, four of the factors, Tennessee Code Annotated section 36-6-106(a)(4), (9), (12), and (14), weigh slightly in Father's favor, while only one factor, Tennessee Code Annotated section 36-6-106(a)(5), weighs in Mother's favor. Therefore, we conclude that the trial court's designation of Father as the primary residential parent is supported by the evidence when viewed in light of the best interest factors, *supra*, and the record as a whole.

## 3. Allocation of Decision-Making

Mother asserts that the trial court erred because it failed to consider Tennessee Code Annotated section 36-6-407(c) or the parties' requests when it awarded Father sole decision-making authority. In allocating decision-making authority, the trial court is statutorily required to consider:

(1) The existence of a limitation under § 36-6-406;

(2) The history of participation of each parent in decision making in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education, extracurricular activities, and religion; and whether each parent attended a court ordered parent education seminar;

(3) Whether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child in each of the following areas: physical care, emotional stability, intellectual and moral development, health, education extracurricular activities, and religion; and

(4) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

Tenn. Code Ann. § 36-6-407(c).

Both parties requested joint decision-making, except as to decisions regarding the Child's education—Mother asked for sole-decision making authority in this area. Mother argues that the fact that the parties are willing to share most decisions for the Child demonstrates their commitment to cooperating. Nonetheless, the trial court's order lacks any specific findings concerning the basis of its decision.

Tennessee Rule of Civil Procedure 52.01 requires trial courts, in non-jury actions, to make specific findings of fact and conclusions of law in its final orders. As this Court has previously explained,

> Tennessee Rule of Civil Procedure 52.01 states that "[i]n all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." "No principle is better known than that which states that a Court speaks through its orders and decrees entered upon the minutes of the Court." *Palmer v. Palmer*, 562 S.W.2d 833, 837 (Tenn. Ct. App. 1977). There is no bright-line test by which to assess the sufficiency of factual findings, but "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013). This requirement is not a "mere technicality." *Roney v. Nordhaus*, No. M2014-02496-COA-R3-CV, 2015 WL 9594638, at *1 (Tenn. Ct. App. Dec. 30, 2015); *Hardin v. Hardin*, No. W2012-00273-COA-R3-CV, 2012 WL 6727533, at *3 (Tenn. Ct. App. Dec. 27, 2012). Findings and conclusions facilitate appellate review by affording a reviewing court a clear understanding of the basis of a trial court's decision. *Hardin,* 2012 WL 6727533, at *5; *In re K.H.*, No. W2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009). "Without such findings and conclusions, this Court is left to wonder on what basis the court reached its ultimate decision." *In re K.H.*, 2009 WL 1362314, at *8.

*Butler v. Pitts*, No. W2016-01674-COA-R3-CV, 2017 WL 3432688, at *4 (Tenn. Ct. App. Aug. 10, 2017). In the absence of findings in the trial court's order, this Court cannot glean its reason for awarding Father sole decision-making authority nor can we discern whether the trial court considered the Tennessee Code Annotated section 36-6-407(c) factors in reaching its decision. Accordingly, we vacate the trial court's award of sole decision-making authority to Father, and we remand the case to the trial court for sufficient findings of facts and conclusions of law regarding the allocation of decision-making authority. Tenn. R. Civ. P. 52.01.

**4. Mother's Parenting Time**

Mother also argues that the trial court erred when it failed to maximize her time with the Child as required under the statute. As set out in context above, Tennessee Code Annotated section 36-6-106(a), provides, in pertinent part, that "the [trial] court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child." Tenn. Code Ann. § 36-6-106 (a). In its final order, the trial court found that because "the parties live in different counties . . . a 50-50 parenting schedule is not appropriate." Thereafter, the trial court awarded Mother every other Friday from 6:00 p.m. until Sunday at 6:00 p.m.

In 2014, the Tennessee Supreme Court explained that

> [a] trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. ***Armbrister v. Armbrister***, 414 S.W.3d 685, 693 (Tenn. 2013) (citing ***Eldridge v. Eldridge***, 42 S.W.3d 82, 88 (Tenn. 2001)). A trial court abuses its discretion when it applies an incorrect legal standard, reaches an illogical conclusion, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. ***State v. Banks***, 271 S.W.3d 90, 116 (Tenn. 2008) (citing ***Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.***, 249 S.W.3d 346, 358 (Tenn. 2008)). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." ***Armbrister***, 414 S.W.3d at 693 (quoting ***Eldridge***, 42 S.W.3d at 88).

***Kelly v. Kelly***, 445 S.W.3d 685, 691-92 (Tenn. 2014). As stated in its order, the trial court's sole ground for awarding Mother only every other weekend with the Child is the fact that the parties live in different counties. Yet, as discussed in detail above, the record shows that Mother has historically been the Child's primary caretaker. Mother has provided a loving and stable home for the Child. Further, the Child is bonded with Mother and with her half-sister, who resides with Mother. While Mother's job as a waitress requires a non-traditional work schedule, the record does not show that Mother's work schedule has interfered with her ability to care for the Child. The fact that the Child sometimes stays with a babysitter so that Mother can work should not be held against Mother, as Mother has to work. From the totality of the circumstances and the history between the parties concerning their respective parenting time, the mere fact that the parties live in different counties is an insufficient reason to justify such a drastic limitation on Mother's parenting time.

Further, despite living in different counties, the testimony demonstrates that neither party is burdened by the exchange location or the drive. Father testified that the exchange location is about ten to twelve miles from his house and it takes him about fifteen to thirty minutes to drive there, depending on traffic.[9] Mother testified that it takes her about twenty to thirty minutes to drive to the exchange location from her house. *Cf. Broadrick v. Broadrick*, No. M2013-02628-COA-R3-CV, 2015 WL 1947186, at *7 (Tenn. Ct. App. Apr. 29, 2015) (where the trial court found that the child could spend up to ten hours per week in a car, the trial court considered the "potential effects of such a significant commute on the child" in fashioning a parenting plan). Evidence in the record also shows that at the time of trial the parties were living in their same residences as when the trial court created the temporary parenting plan, which the parties operated under for eighteen months. Here, neither party complained about the travel time or the exchange location; thus, there is no evidence nor basis to justify limiting Mother's parenting time to every other weekend as ordered by the trial court.

While we are cognizant that "[i]t is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court," we conclude that the trial court abused its discretion because it reached an illogical conclusion when it awarded Mother only every other weekend with the Child. *Armbrister*, 414 S.W.3d at 693 (quoting *Eldridge*, 42 S.W.3d at 88). As discussed above, the evidence does not support such a custody arrangement. It is clear that such an arrangement would not be in the Child's best interest. Due to the Child's bond with both parents, significantly truncating her time with either would likely cause the Child distress.

Accordingly, we reverse the trial court's Parenting Plan as to the parties' parenting time and remand to the trial court for reconsideration of the visitation schedule in view of the concerns raised in this Opinion. We recognize that "determining the details of parenting plans is 'peculiarly within the broad discretion of the trial judge,'" however, based on the foregoing analysis, we instruct the trial court to fashion a more equal parenting schedule between the parties. *Kelly*, 445 S.W.3d at 692 (quoting *Armbrister*, 414 S.W.3d at 693). We also instruct the trial court to consider Mother's work schedule and Father's flexibility when making the new arrangement. In its previous order, the trial court granted Mother visitation only on weekends when she testified that she worked Saturdays and Sundays from 9:00 a.m. until 4:00 p.m. or 5:00 p.m. Such a visitation schedule is illogical given Mother's work schedule. Further, Mother and Father could benefit from a non-traditional visitation schedule given Mother's work schedule and Father's flexibility as a stay at home parent. Similarly, Father should bear the greater travel burden because of his flexible schedule. Tennessee Code Annotated section 36-6-106(a)(14) allows the trial court to "make accommodations consistent" with the parents' schedules, and we encourage the trial court to do so. Tenn. Code Ann. § 36-6-106(a)(14).

---

[9] Father also testified that the exchange location is roughly the same distance between Father's home and Mother's home.

### 5.  Child Support

We recognize that neither party appealed the trial court's child support award. However, because we have instructed the trial court to amend the visitation schedule and award Mother equal parenting time, we also instruct the trial court to revisit the child support award on remand.  Recalculation of child support is necessary because the amount of parenting time the alternative residential parent receives is a factor in calculating the amount of child support the alternative residential parent owes. *See* Tenn. Comp. R. & Regs. 1240-2-4-.04(7) (2008).  Accordingly, we reverse the trial court's Parenting Plan concerning the amount of child support and remand for a recalculation of support in view of the revised parenting schedule.

### C.  Attorney's Fees on Appeal

Both parties request attorney's fees incurred on appeal.  Under Tennessee Code Annotated section 36-5-103(c), "[a] prevailing party may recover reasonable attorney's fees" in suits involving changes in child custody.  Tenn. Code Ann. § 36-5-103(c). However, it is left to this Court's sound discretion whether to award such fees. *See* ***Chaffin v. Ellis***, 211 S.W.3d 264, 294 (Tenn. Ct. App. 2006).  "When considering a request for attorney's fees on appeal, we also consider the requesting party's ability to pay such fees, the requesting party's success on appeal, whether the requesting party sought the appeal in good faith, and any other equitable factors relevant in a given case." ***Darvarmanesh v. Gharacholou***, No. M2004-00262-COA-R3-CV, 2005 WL 1684050, at *16 (Tenn. Ct. App. July 19, 2005).  Under the circumstances of this case, we exercise our discretion and respectfully deny both parties' request for attorney's fees for this appeal.

### V.  Conclusion

For the foregoing reasons, we vacate the trial court's order concerning its award of sole decision-making authority to Father.  We reverse the trial court's order concerning both the visitation schedule and child support.  The trial court's order is otherwise affirmed, and the case is remanded for further proceedings consistent with this Opinion. Costs of the appeal are assessed one-half to Appellant, Kendall R., and one-half to Appellee, Joshua R., for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE